**In re Dennis KARFAKIS and Vickie Karfakis, trading as Dunkin' Donuts, Debtor.**

**Bankruptcy No. 93–15009R.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 10, 1993.

Frederic J. Baker, Asst. U.S. Trustee, Office of the U.S. Trustee, Philadelphia, PA.

Earle M. Forte, III, Blank Rome Comisky & McCauley, Philadelphia, PA.

Arthur L. Pressman, Craig Tractenberg, Abraham, Pressman & Bauer, Philadelphia, PA.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

Before the Court is a Motion for Relief from the Automatic Stay filed by Dunkin' Donuts of America, Inc. and Dunkin' Donuts of Pennsylvania, Inc. (collectively "Dunkin' Donuts") the Franchisor and Landlord respectively of the instant Debtors who operate a Dunkin' Donuts Store at 9173 Roosevelt Boulevard, Philadelphia Pennsylvania. Testimony and other evidence was taken at hearings held November 10, 1993, November 22, 1993, and November 29, 1993. Because the underlying commercial real estate lease and Franchise Agreement appear to the Court to constitute a single, composite, contractual agreement between the parties, and because it appears to the Court that of this composite agreement, only the Franchise Agreement component has been effectively terminated pre-petition, the Court concludes that the Agreement as a whole remains extant on a post-petition basis, and thus may be considered as an asset susceptible to a potential assumption and assignment by the Debtors in the course of this Chapter 11 proceeding. On the basis of testimony presented relative to the latter issue, the Court concludes that the Debtors have highly likely prospects to consummate a successful liquidating plan of reorganization, and that such fact, together with the conditions hereinafter discussed, constitute adequate protection for the movants herein. The pending motion for relief from the automatic stay will therefore be denied.

## BACKGROUND

On April 2, 1986, Dennis Karfakis, Vickie Karfakis, and Garasimos Matafias became the owner/operators of a Dunkin' Donuts franchise store upon their concurrent execution of a commercial real estate lease (the "Lease") for 1) business premises located at 9173 Roosevelt Boulevard, Philadelphia, Pennsylvania, and 2) a Dunkin' Donuts Franchise Agreement (the "Franchise Agreement").[1] The underlying real estate upon which the store sits is apparently owned by a third party and is leased to Dunkin' Donuts which itself, in turn, leases the real estate, and Building constructed thereon, to the Debtors. The contents of the store including the equipment are owned by the Debtors and were separately financed by another third party.[2] The Lease and the Franchise Agreement set forth various and sundry financial and reporting obligations with which the Debtors must comply in order to maintain their good standing with Dunkin' Donuts.

---

1. In 1989, Matafias was released from these contracts by Agreement of all parties and he apparently does not figure further in these proceedings.

2. Testimony was offered that an entity known as Adam, Inc. actually owns the equipment but that this entity is itself 100% owned by one or both Debtors.

Each agreement provides default clauses setting forth the penalties which face the lessee/franchisee in the event of non-compliance. These paragraphs found at Paragraph 9 and Paragraph 17 in the Franchise Agreement and the Lease respectively, in pertinent part, provide as follows:

### Franchise Agreement

9.A. In the event that the FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by the FRANCHISEE, or such a petition is filed against and consented to by the FRANCHISEE, or is not dismissed within thirty (30) days, or if the FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of the FRANCHISEE or other custodian for the FRANCHISEE'S business or assets is filed and is consented to by the FRANCHISEE, or is not dismissed within thirty (30) days, or a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law should be instituted by or against FRANCHISEE or if the real or personal property of the FRANCHISEE shall be sold after levy thereupon by any sheriff, marshal or constable, then upon the occurrence of any of said events, the FRANCHISEE shall be deemed to be in default under this Agreement and all rights granted to the FRANCHISEE hereunder shall thereupon terminate without any need for notice to the FRANCHISEE and this Agreement shall thereupon be terminated.

9.B. Except as provided in Paragraph 9.A., if the FRANCHISEE shall be in default under the terms of this Agreement, except for Paragraphs 4.E. or 4.F. and such default shall not be cured within thirty (30) days after receipt of written Notice to Cure from DUNKIN' DONUTS, then, in addition to all other remedies at law or in equity, DUNKIN' DONUTS may immediately terminate this Agreement. If the FRANCHISEE shall be in default under Paragraphs 4E. or 4.F. of this Agreement and such default shall not be cured within seven (7) days after receipt of a written Notice to Cure from DUNKIN' DONUTS,

DUNKIN' DONUTS may immediately terminate this Agreement. Termination of this Agreement under such circumstances shall become effective immediately upon the date of receipt of a written Notice of Termination by the FRANCHISEE. No Notice to Cure shall be given or required in the case of intentional under-reporting of GROSS SALES or financial data. The FRANCHISEE shall be in default under this Agreement:

1. If the FRANCHISEE fails, refuses or neglects to pay when due to DUNKIN' ·DONUTS any monies owing to DUNKIN' DONUTS or to The DUNKIN' DONUTS Franchise Owners Advertising and Sales Promotion Fund;

2. If the FRANCHISEE fails to submit when due reports or financial data which DUNKIN' DONUTS requires under this Agreement;

3. If FRANCHISEE fails to carry out in all respects its obligations under any lease for the DUNKIN' DONUTS SHOP and the lease is terminated or under any mortgage, equipment agreement, promissory note, conditional sales contract or other contract materially affecting the DUNKIN' DONUTS SHOP to which the FRANCHISEE is a party or by which the FRANCHISEE is bound whether or not DUNKIN' DONUTS is a party thereof; or

4. If the FRANCHISEE fails to comply with any of the requirements imposed upon the FRANCHISEE by this AGREEMENT.

### Lease

17. (b) If the LESSEE shall be in default under Paragraphs 3(a), 3(b), 3(c) or 4 of this LEASE and such default shall not be cured within ten (10) days after receipt of a written Notice to Cure thereof from the LESSOR, the LESSOR may immediately terminate this LEASE. In the event of a default under the terms of the remaining Paragraphs of this LEASE, such default shall not be cured within thirty (30) days after receipt of written Notice to Cure thereof from the LESSOR, then, in addi-

tion to all other remedies at law or in equity, the LESSOR may immediately terminate this LEASE. If the LESSOR has been required under the terms of this Paragraph to give to the LESSEE two separate notices because of two distinct defaults in the case of nonpayment of rent under the provisions of Paragraph 3 or additional rent in any LEASE YEAR under the provision of Paragraph 4, then the LESSOR thereafter shall no longer be required during the balance of the term of this LEASE to give the LESSEE any additional written Notice to Cure before terminating this LEASE. Termination of this LEASE under such circumstances shall become effective immediately upon the date of receipt of a written Notice of Termination by the LESSEE. The LESSEE shall be in default under this LEASE.

(1) If the LESSEE fails, refuses or neglects to pay promptly to the LESSOR any monies owing to the LESSOR on date due;

(2) If the LESSEE fails to submit when due reports or financial data which the LESSOR requires under this LEASE; or

(3) If the LESSEE fails to carry out in all respects the LESSEE'S obligations and agreements under this LEASE, or under any equipment agreement, promissory note, conditional sales contract or other contract materially affecting the DUNKIN' DONUTS SHOP to which the LESSEE is a party or by which the LESSEE is bound.

The Debtors' payment history with Dunkin' Donuts since the inception of the Franchise Agreement and the Lease has been erratic. Specifically, evidence adduced at the hearing of this matter established that the Debtors fell into default on at least two separate occasions. These defaults were settled by the parties on each occasion through the execution of a promissory note, the terms of which apparently required the Debtors to remain current on a going-forward basis, but

permitted them to abate their outstanding arrears to Dunkin' Donuts, with interest, over time.[3] Evidence established that the Debtors had some difficulty complying with the settlement terms set forth in the two respective promissory notes from the past, but that the Debtors, for the most part, eventually completed repayment of most of their existing arrears from prior defaults. Evidence further established that by late 1992, the Debtors were again in arrears with Dunkin' Donuts with respect to advertising fees, franchise fees, percentage rent payments, Common Area Maintenance charges, and/or electricity bills. Evidence established that in late 1992, the Debtors had discussions with Dunkin' Donut personnel concerning their then outstanding arrears and the prospect of a yet another promissory note arrangement. There was conflicting testimony as to the precise content and status of these settlement discussions between their inception in late 1992 and their cessation in or about May 1993. The Debtors' testimony was to the effect that they were verbally led to believe that a promissory note arrangement, similar to those they had entered into in the past, would again be acceptable to Dunkin' Donuts. The Debtors each testified that in reliance on these discussions, they tendered a down payment to Dunkin' Donuts in the amount of $8,000.00, which payment they believed was to be applied against their then outstanding arrears, and was tendered by them in anticipation of their receiving promissory note paperwork reflecting terms for repayment of the remaining balance due. Dunkin' Donuts representatives testified, to the contrary, that the tentative willingness of Dunkin' Donuts to enter into a third note arrangement with the Debtors in late 1992 to early 1993 was predicated on payment by them of a deposit of not less than $10,000.00, together with an agreement on the part of the Debtors to strictly comply in remitting all future payments due to Dunkin' Donuts on a current basis. As to the latter issue, the Debtors testified that it was their expectation at the time of these discussions that if for any reason they failed to remain current

---

3. Testimony suggested that of the two past promissory notes, one related to arrearages from another location (Oxford Ave.) The relationship between the Oxford Ave Store Note and the Roosevelt Blvd. Store Note, if any, is unclear.

prospectively, any additional arrearages would be rolled into the principal balance of the note at the time of its execution and would be provided for in that fashion. Dunkin' Donuts disputes this allegation. The parties agree that in May of 1993, counsel for Dunkin' Donuts tendered to the Debtors a letter pursuant to the Franchise Agreement which contained a Notice of Intention to terminate the Franchise Agreement if certain existing defaults were not cured. The Debtors do not dispute that all of the alleged defaults were not cured thereafter, although they have taken issue with the precise amount of certain outstanding balances as delineated in the letter of May 27, 1993. Notwithstanding the Debtors' failure to cure the outstanding arrearages consistent with the demand contained in the May 27, 1993 letter, the parties largely continued to deal with one another in the ordinary course of business on essentially the same basis as before. The Debtors maintain that thereafter they were still verbally assured that a third promissory note would be forthcoming. Dunkin' Donuts disputes this allegation. On June 15, of 1993, counsel for Dunkin' Donuts sent a follow up letter to the Debtors advising them of their failure to have cured the defaults as demanded in the May 27, 1993 letter and further advising them that the Franchise Agreement and the Lease were terminated. Notwithstanding its written course of conduct, the Debtors insist that Dunkin' Donuts also verbally advised them that, despite termination of the Franchise Agreement, Dunkin' Donuts would still allow the Debtors to sell their business to a third party. Additional testimony at the hearing established that such sales in lieu of Franchise termination were a not uncommon way of settling dilemmas such as that in which the Debtors found themselves. In August of 1993, the Debtors alerted Dunkin' Donuts that they had located a buyer for their business at a price of $320,000.00. The Debtors have offered expert testimony that this was a fair and reasonable price for the Debtors' business and lay testimony that such price would produce a fund sufficient to retire all Dunkin' Donuts arrearages, pay in full all other creditors of the Debtors, and return to the Debtors some surplus. Dunkin' Donuts offered rebuttal expert testimony that the value of the Debtor's business was no more than $147,000. Of the competing expert testimony, the Court is more persuaded by that of the Debtors. The value of the business as calculated by Dunkin' Donuts was arrived at via seemingly rigid adherence to a financial formula which did not sufficiently take into account either comparable sales of other local franchises or the relatively good location of the Debtors' store. Furthermore, the Court concludes that the best evidence of value is generally, and is here, the existence of a pending offer by a fully informed Buyer who is ready, willing and able to consummate an arms length transaction with a Seller. Those circumstances exist here with the pending $300,000.00 purchase offer.[4] Dunkin' Donuts objection that this offer should be disregarded because it overvalues the business and because the premium price will arguably impair the Buyers ability to perform its future contractual obligations to Dunkin' Donuts must be rejected because there is an inadequate foundation on this record to support such an argument. The argument is predicated on speculation as to the prospective Buyer's motivations, including the Buyers presumed target rate of return on his investment and his prospects for securing an extension of the Lease and the Franchise Agreement which expire in 1999. No competent evidence was offered to establish the Buyer's expectations, or lack thereof, on these or any other issues. On the other hand, testimony established that Dunkin' Donuts itself is presently negotiating sale of the business (in the event it succeeds in recapturing it) for a price of $297,000.00. Dunkin' Donuts argues that this transaction is not comparable for, among other reasons, the proposed term is for sixteen years. The sixteen year term of that transaction, however, obviously contemplates a renewal by Dunkin' Donuts in 1999 of the ten (10) year option on its ground Lease for the Roosevelt Boulevard premises. This same course of

---

4. The prospective buyer has apparently reduced the pending offer to $300,000.00 from $320,- 000.00 in light of the delay in going to closing.

conduct by Dunkin' Donuts could easily figure into the present proposed Buyers logic even though such actions by Dunkin' Donuts are less than a certainty for him. Similarly, Dunkin' Donuts argues that the offer it is negotiating eliminates for its buyer a remodeling cost obligation of $100,000.00 to $150,000.00 with which the Debtors' Buyer must contend. Testimony as to this issue established that contractual remodeling obligations are frequently a subject of negotiation between Dunkin' Donuts and its Franchisees. The Debtors' Buyer may also have certain expectations, realistic or otherwise, as to this issue. In the absence of evidence on this point, the court cannot second guess the prospective Buyer's decisions. Accordingly, and under all the circumstances, the Court concludes that the pending offer of $300,000 represents a highly reasonable indication of the present value of the Debtors' business.

Following the purchase offer in August 1993, Dunkin' Donuts advised the Debtors of their unwillingness to permit sale of the business and of Dunkin' Donuts position that the Franchise Agreement was terminated. State Court litigation was thereafter commenced by Dunkin' Donuts seeking 1) injunctive relief to prevent the Debtors from continuing to operate the Franchise business and 2) an Order for possession of the Roosevelt Blvd. premises. Prior to that litigation being finalized, and presumably in light thereof, the Debtors filed the instant Chapter 11 proceeding. In addition to the instant pending 362 Motion, there are also pending, although not now before the Court, a Motion on the part of the Debtors to assume and assign their agreements with Dunkin' Donuts and thereby sell the business to the prospective buyer of August, 1993, and an adversary complaint initiated by the Debtors against Dunkin' Donuts seeking a determination that if the Debtors' contracts with Dunkin' Donuts are deemed to have been extinguished by a prepetition termination, such termination constitutes a "transfer" that was fraudulent and is therefore avoidable according to the provisions of 11 U.S.C. Section 548 and 550. Dunkin' Donuts has replied to the adversary proceeding with a Motion to Dismiss, the disposition of which remains pending.

## DISCUSSION

Several disputes exist between the parties as to the precise course of their pre-petition dealings with one another. The Debtors maintain that they were either expressedly or at least impliedly promised a third promissory note arrangement. Such note arrangement never came to pass and it is presumably the Debtors contention that in reliance upon such representations they delayed taking other actions they might otherwise have taken, such as attempting earlier to consummate a sale of their business. Despite the Debtors' understandably emotional testimony on these points, the Court is not able to conclude that Dunkin' Donuts misled the Debtors to their prejudice. Nor on the record before it can the Court ascertain the presence of a binding commitment on the part of Dunkin' Donuts to extend a third promissory note arrangement to the Debtors. Likewise, the Court cannot accept the notion that the acceptance of various contractual payments by Dunkin' Donuts after transmittal of the Franchise Agreement Termination Letter constituted a knowing and/or intelligent waiver such as would abrogate the effect of that communication.

The pivotal issue becomes whether there has been an effective pre-petition termination of the Debtors' contractual relationship with Dunkin' Donuts. If there has been, cause would exist to modify the automatic stay as to Dunkin' Donuts. The Debtors only realistic hopes to consummate a Plan of Reorganization hinge upon their ability to sell their business. Absent the viability of the Debtors' contractual relationship with Dunkin' Donuts, the Debtors possess little to assume and assign to a buyer of their business.

Dunkin' Donuts's position is that the Debtors' lease and Franchise Agreement were effectively terminated pursuant to their terms, and therefore the Debtors have nothing to assume. In response, the Debtors contend that neither the lease nor Franchise Agreement was terminated. Moreover, relying on *Braniff, Inc. v. GPA Group PLC (In re Braniff)*, 118 B.R. 819 (Bankr.M.D.Fla. 1989); *McKinney v. Gannett Co., Inc.*, 660 F.Supp. 984 (D.N.M.1981); *U.S. v. Bethlehem Steel Corp.*, 315 U.S. 289, 62 S.Ct. 581,

86 L.Ed. 855 (1942); and *In re Cole Bros., Inc.*, 137 B.R. 647 (Bankr.W.D.Mich.1992), the Debtors contend the lease and Franchise Agreement constitute one agreement which must be terminated as a whole. In other words, the Debtors' second position is that because the Franchise Agreement and lease constitute one indivisible agreement, if either the lease or Franchise Agreement was not effectively terminated the entire agreement remains extant, and the Debtors' interest therein forms property of the Bankruptcy Estate under 11 U.S.C. § 541. To the extent the Debtors prevail on the composite contract issue, their legal position, *vis a vis*, 11 U.S.C. § 541 is not open to serious question. See *In re 48th Street Steakhouse, Inc.*, 61 B.R. 182 (1986), *affm'd*, 77 B.R. 409, *affm'd*, 835 F.2d 427, (2nd Cir.1987), *certiorari den'd*, 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988); *In re Lewis*, 15 B.R. 643 (E.D.Pa. 1981); *In re Mumpfield*, 140 B.R. 578 (M.D.Ala.1991).

■ In *In re Braniff*, the court said "[m]ultiple contracts documents may form one uniform agreement." *In re Braniff*, 118 B.R. at 844. As in the instant case, where debtors have attempted to assume related contracts post-petition pursuant to § 365, other bankruptcy courts have recognized the concept that certain agreements are indivisible. *See In re Cole Bros.*, 137 B.R. at 651; *In re T & H Diner, Inc.*, 108 B.R. 448, 454 (Bankr.D.N.J.1989; *In re Ritchey*, 84 B.R. 474, 476 (Bankr.N.D.Ohio 1988); *Bistrian v. East Hampton Sand & Gravel Co., Inc. (In re East Hampton Sand & Gravel Co.)*, 25 B.R. 193, 199 (Bankr.E.D.N.Y.1982). The Court is persuaded by this body of law which suggests that two contracts which are essentially inseparable can be, and should be, viewed as a single, indivisible agreement between the parties. Hence, the court believes it is necessary to determine whether the Debtor's Franchise Agreement and lease with Dunkin' Donuts are indivisible.

One test used to determine whether separate contracts constitute an indivisible agreement is whether the parties assented to all of the promises as a single whole, so that there would have been no agreement whatever if any promise or set of promises were struck out. *McKinney v. Gannett Co., Inc., supra*, at 1005. The foregoing test was articulated in the District of New Mexico and would not necessarily control here, because technically contract interpretation is a matter of state law and, therefore, bankruptcy courts should rely on applicable state law to determine whether an agreement is indivisible. *In re Ritchey*, 84 B.R. at 476.

■ In discussing the divisibility of contractual agreements, the Pennsylvania Supreme Court said "[t]he primary inquiry in resolving this question is whether the language employed in the contract clearly indicates the intention of the parties that the contract of the parties be entire or severable.[5]" *Heilwood Fuel Co., Inc. v. Manor Real Estate Co.*, 405 Pa. 319, 327, 175 A.2d 880, 884 (1961). If the language of the parties' written agreement does not make their intention clear, the court should seek other aids; for example, the court can use practical interpretation and consider the parties' construction of the agreement as evidenced by their conduct. *Id.*

■ In the instant case, the evidence established that the Franchise Agreement and the Lease are inextricably interwoven and for all practical purposes comprise a single contractual relationship. Aside from being coterminous and containing cross default provisions, it is readily apparent that one agreement is of no utility without the other. The Franchise Agreement permits the Debtor to operate a specific Franchise Store at a specific location which is simultaneously leased to the Debtor/Franchisee by a Dunkin' Donuts affiliate as Lessor. The parties executed both contracts on the same date. The court is persuaded by these facts that the parties intended the two separate contracts, the Lease and Franchise Agreement, to constitute a single, contractual agreement.

The court must next determine whether Dunkin' Donuts has effectively terminated

---

**5.** Like the law of Pennsylvania, the law of several states, including New York, New Jersey, Illinois, and Massachusetts, also consider the parties' intent to be the critical criterion in determining whether an agreement is divisible or indivisible.

both the Lease and the Franchise Agreement, because, if either contract is viable, the entire agreement remains extant.

On May 27, 1993, counsel for Dunkin' Donuts tendered to the Debtors a letter pursuant to the Franchise Agreement which contained a Notice of Intention to Terminate the Franchise Agreement if certain existing defaults were not cured. Although the Debtors have taken issue with certain outstanding balances delineated in the letter of May 27, 1993, they admit that some of the defaults were not cured. On June 15, 1993, counsel for Dunkin' Donuts sent a follow-up letter to the Debtors advising them of their failure to cure the defaults as demanded in their letter of May 27, 1993, and further advising the Debtors that the Franchise Agreement and the Lease were terminated. Hence, pursuant to the terms of the Franchise Agreement Dunkin' Donuts effectively terminated the Debtors' Franchise Agreement. Dunkin' Donuts contends that the Lease was also terminated upon receipt of the two aforementioned correspondence by the Debtor. The Debtors' position is that under Pennsylvania law, the Lease has not been effectively terminated.

The Debtors' reliance on Pennsylvania law with respect to the issue of the Lease termination raises the question of whether Pennsylvania law or Massachusetts law should govern the interpretation of the parties' composite contract, because the Franchise Agreement contains a clause providing that "[t]his agreement shall be interpreted, construed[,] and governed by the laws of the Commonwealth of Massachusetts. The Lease contains no similar provision, requiring the application of the law of Massachusetts, and in fact is silent on the choice of law question. In the absence of an effective choice of law provision in the Lease, the court must decide which state's law, Pennsylvania or Massachusetts, should be looked to in determining whether the Lease has been effectively terminated.

This choice of law issue is addressed in the Restatement (Second) Conflicts of Law which, in pertinent part, provides as follows:

§ 188    Law Governing in Absence of Effective Choice by the Parties

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to the issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

.        .        .        .        .

These contacts are to evaluated according to their relative importance with respect to the particular issue.

§ 6    Choice-of Law Principles

(2) When there is no [statutory] directive, the choice relevant to the choice of the applicable rule of law include

(b) the relevant policies of the forum,

Restatement (Second) Conflict of Laws §§ 6, 188 (1971).

■ In the instant case, the parties executed the lease in their respective states, the Debtors in Pennsylvania and Dunkin' Donuts in Massachusetts. Because the subject matter of the contract, the leased property, is located in Pennsylvania, performance of the lease occurred in Pennsylvania. The court believes the location of the leased premises and, therefore, necessity of performance of the lease within this state weighs heavily in favor of a finding that Pennsylvania law should be applied to determine whether the lease was effectively terminated. Moreover, a significant policy difference exists between the laws of the two states. In Pennsylvania, a strong public policy exists preventing eviction of families from their residences, and that same policy applies as to Pennsylvania commercial leases. *In re Telephonics*, 85 B.R. 312, 316 (Bankr.E.D.Pa.1988). Massachusetts law is apparently not based on a similar policy. *See e.g., In re Players' Pub, Inc.*, 45 B.R. 387 (Bankr.D.Mass.1985). Inasmuch as a significant policy difference exists, and because the leased property is within Pennsylvania, the court believes Pennsylvania law must be applied.

Under Pennsylvania law, a lease is not terminated when the tenant fails to pay rent until the tenant is physically evicted. *In re Telephonics,* 85 B.R. at 316. *See also, In re Morningstar Enterprises, Inc.,* 128 B.R. 102, 106 (Bankr.E.D.Pa.1991); *In re C & C TV & Appliance, Inc.,* 97 B.R. 782 (Bankr.E.D.Pa.1989) *aff'd,* 103 B.R. 590 (E.D.Pa.1989); *In re Sudler,* 71 B.R. 780 (Bankr.E.D.Pa.1987). This is because, under Pennsylvania common law and court rule, a tenant retains a right to cure any rental deficiency and preserve the tenancy until the moment of actual valid and complete eviction. *In re Telephonics,* 85 B.R. at 316.

In reliance on its letter of termination dated June 15, 1993, Dunkin' Donuts contends that it effectively terminated the Debtors' lease. State Court litigation initiated by Dunkin' Donuts seeking to evict the Debtors from the leased premises was pending and was unfinalized as of the date of the filing of the Bankruptcy petition in this matter. Because Dunkin' Donuts had not obtained physical possession of the premises via eviction, as required under Pennsylvania law, Dunkin' Donuts failed to effectively terminate the Debtors' lease pre-petition.

Dunkin' Donuts has cited the Court to the cases of *Burger King Corp. v. Levine (In re Levine),* 22 B.R. 16 (Bankr.S.D.Fla.1982) and *Days Inn of America Franchising, Inc. v. Gainesville P–H Properties, Inc. (In re Gainesville P–H Properties),* 77 B.R. 285 (Bankr.M.D.Fla.1987), for the proposition that pre-petition termination of a Franchise Agreement and lease leaves nothing for a debtor in possession to assume and assign. In *In re Gainesville P–H Properties,* the Court said "[w]here an agreement requires notice of termination, if the notice is effective under state law and no further act is required to effectuate the termination, the termination becomes effective in accordance with its terms. *In re Gainesville P–H Properties,* 77 B.R. at 296. As already discussed, notice of termination, by itself, is not sufficient to effectuate a lease termination in Pennsylvania. Therefore, Dunkin' Donuts' reliance on these two cases is inapposite.

In this instance, the failure of Dunkin' Donuts to have effectively terminated the lease component of the parties' agreement on a pre-petition basis leaves that component of the relationship extant on a post-petition basis. It is the conclusion of the Court that partial termination of an integral two-part agreement on a pre-petition basis is ineffective to render the entire agreement terminated on a pre-petition basis, and that the instant Franchise/Lease Agreement as a whole has, therefore, survived post-petition.

Having found that the Franchise/Lease Agreement has survived post-petition, the Court finds that there has not been sufficient grounds presented for modification of the automatic stay. Evidence established that there is a ready, willing and able buyer for the Debtors' business at a price of $300,000.00, which sum is apparently more than sufficient to satisfy in full all Dunkin' Donuts arrearages, satisfy in full all creditors of the Debtor, and return to the Debtors some surplus. Under these circumstances, it can hardly be argued that the property in question in not necessary for an effective reorganization of the Debtors, nor can it convincingly be argued that the asset has no equity.

As additional "cause" for modification of the Automatic Stay, Dunkin' Donuts has underscored the failure of the Debtor to make all current post-petition payments. The Court agrees that in certain circumstances this may constitute grounds for modification of the automatic stay. Accordingly, continuation of the automatic stay pending consummation of any sale of the business will be conditioned on the Debtor's strict compliance with all post-petition requirements of the Franchise Agreement and the Lease.

An Order consistent with the foregoing conclusions accompanies this Opinion.

### ORDER

AND NOW, this 10th day of December, 1993, it is hereby

ORDERED, that the Motion For Relief From The Automatic Stay filed by Dunkin' Donuts Corp. of America Inc. and Dunkin' Donuts of Pennsylvania, Inc. be and the same hereby is **DENIED.**

Continuation of the automatic stay shall, however, be conditioned upon the Debtors remaining current with respect to all post-petition payments due Dunkin' Donuts under the Debtors' Lease and Franchise Agreement. Expedited re-listing of this Motion will be given consideration upon the filing of an appropriate request by the Movants averring any further post petition defaults.