**PUEBLO CHEMICAL, INC.**

v.

**III ENTERPRISES INC., V.**

Civ. A. No. 94–1705.

United States District Court,
E.D. Pennsylvania.

June 14, 1994.

552

Frank J. Perch, III, Spector, Gadon & Rosen, Philadelphia, PA, for III Enterprises Inc., V.

J. Gregg Miller, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Pueblo Chemical, Inc.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

Appellant, Pueblo Chemical, Inc. (hereinafter termed "Pueblo"), appeals to this Court from an adverse judgment in the United States Bankruptcy Court for the Eastern District of Pennsylvania. The Bankruptcy Court held that Pueblo and the Appellee, III Enterprises V (hereinafter termed "Enterprises"), did not have a legally enforceable contract. The Bankruptcy Court determined as a preliminary matter that the Loan Term Sheet, and the option to purchase provision (hereinafter termed "Option") located therein, were missing essential terms and lacked the consideration necessary to make them binding final agreements. Because we agree that the writing lacked essential terms, and merely evinced an intention to continue negotiations toward the creation of a final contract, we need not reach the other arguments raised by the parties.

This Court acts as an appellate court for the purpose of reviewing decisions of the Bankruptcy Court regarding core matters. *See In re St. Charles Preservation Investors, Ltd.,* 916 F.2d 727 (D.C.Cir.1990); *Bank of Lafayette v. Baudoin,* 981 F.2d 736 (5th Cir. 1993). We employ a plenary standard of review on issues of law and a clearly erroneous standard of review on questions of fact. *Sharon Steel Corp. v. National Fuel Gas Distrib.,* 872 F.2d 36 (3d Cir.1989). As the Bankruptcy Court found, and the parties

agree, we apply Delaware law to the present case of contract interpretation. *Pueblo Chemical, Inc. v. III Enterprises, Inc. V,* 163 B.R. 453, 460 (Bankr.E.D.Pa.1994).

## I. FACTS

The facts as found by the Bankruptcy Judge are for the most part undisputed: During the first quarter of 1993, Frank O'Brien, the sole owner of both Enterprises and O'Brien Environmental Energy, Inc. (hereinafter termed "O'Brien Energy"), was introduced to Pueblo's President, Elizabeth Sumerlin. The two had never met or conducted business together prior to this introduction. They began negotiations for an agreement in which, *inter alia,* Pueblo agreed to grant Enterprises a $4.7 million loan that Enterprises needed to settle certain tax liabilities and bank debts. (Tr. at 21–22). In exchange, Enterprises agreed to secure the loan with 1.3 million shares of O'Brien Energy Class B stock, repay the loan at 7.50% interest annually, and grant Pueblo an option to purchase 3 million additional shares of O'Brien Energy Class B stock at $5.00 per share. (Tr. at 21–22). These terms were reduced to writing in a two page Loan Term Sheet signed by both parties on July 30, 1993. *Pueblo,* at 456.

On August 5, 1993, five days before the agreed upon closing date of the loan, the two parties encountered difficulties in their negotiations and were unable to resolve all the open issues or finalize the documents. (Tr. at 38, 53, 64–66). Pueblo made additional demands upon O'Brien to sign a non-competition agreement and to further guarantee the loan. (Tr. at 55–56, 64, 69–70). It is unclear from the record whether the guarantee was to be recourse or non-recourse. (*Compare* Tr. at 59 *with* Tr. at 70).[1] Pueblo and Enterprises had also not agreed upon and finalized the non-competition agreement, (Tr. at 65), the clearing of encumbrances to the title of the Enterprises building, (Tr. at 44–45, 66),

the clearing of bank liens on the stocks, (Tr. at 44), the obtaining of bank consents, (Tr. at 66), as well as other monetary issues, (Tr. at 64). There may have been as many as 13 unsettled issues as of the August 5, 1993 meeting. (Tr. at 66).

There was also disagreement over the terms of the Option. Sumerlin testified that the Option contained in the Loan Term Sheet existed as soon as the Loan Term Sheet was signed and was not contingent upon the drawdown of the loan by Enterprises. (Tr. at 41–42). However, the Loan Term Sheet states that the Option would arise at the closing of the loan.[2] *Pueblo,* at 456. Subsequently, the parties spoke several times over the telephone in attempts to resolve the conflicts. (Tr. at 57, 66–67). Still, by August 10, 1993, the scheduled closing date, the parties had not yet executed a final contract.

On August 17, 1993, Pueblo commenced an action for an injunction to prevent O'Brien from refusing to close the contemplated loan, or from in any manner compromising Pueblo's rights under the contemplated Option. *Pueblo,* at 457. Enterprises filed a voluntary Chapter 11 petition on October 8, 1993. Pueblo alleged in this adversary action that Enterprises filed its petition solely to avoid honoring the alleged agreement between them. *Pueblo,* at 470. Further, Pueblo alleged that Enterprises was acting in bad faith insofar as it never intended to honor the alleged agreement and was merely "shopping the deal". (Tr. at 57).

## II. DISCUSSION

■ The Loan Term Sheet executed between Enterprises and Pueblo consists only of a two-page, sparsely-detailed document. It includes several provisions, such as the loan amount, loan term, Option, annual interest rate, and pre-payment terms, that appear to be complete and acceptable as segments of an agreement. The Bankruptcy Judge

---

1. Sumerlin testified that it was to be a non-recourse guarantee, but Edward G. Fitzgerald, Enterprises' lawyer, testified that it was to be a full recourse guarantee.

2. The Loan Term Sheet provided the "Term" of the agreement would be "24 months from Draw-

down A", i.e., Enterprises' first draw on the loan fund. Paragraph 7 provides: "Option to expire 24 months from the funding of Drawdown A". Drawdown A was scheduled to occur at the closing of the loan, no later than August 10, 1993.

found, however, that the document lacked other material terms such as repayment terms, default terms, representations, and covenants. A review of the agreement discloses that it also lacked collateral terms, bank consents, specific terms of the Option, and guarantee terms. We agree with the Bankruptcy Judge that, when viewed as a whole, the document lacks material terms and only evinces an intention to negotiate toward a possible final contract; rather than, as Pueblo suggests, signifying a binding agreement as it now stands.

Under Delaware law and basic principles of contract interpretation, a "contract comes into existence if a reasonable person would conclude, based on the objective manifestations of intent and the surrounding circumstances, that the parties intended to be bound to their agreement on all essential terms." *Telephone & Data Systems, Inc. v. Eastex Cellular, L.P.*, C.A. No. 12888, slip op. at 9, 1993 WL 344770 (Del.Ch. Aug. 27, 1993). *See also Leeds v. First Allied Connecticut Corp.*, 521 A.2d 1095, 1101 (Del.Ch. 1986). Under this test, it is apparent that the Loan Term Sheet with the Option provision is not a binding contract. Not only is the document lacking, or at least unclear concerning essential terms, but the totality of the circumstances strongly suggests that the parties were not intending to be bound by the Loan Term Sheet. For example, the collateral offered for the loan was already pledged as security for other debt. Although no recourse provision was included in the Loan Term Sheet, the parties later could not agree whether the loan was intended to be guaranteed.[3]

■ The court can only enforce the intent of the contracting parties. Because in-

tent is a factual matter, *Itek Corp. v. Chicago Aerial Indus., Inc.*, 248 A.2d 625, 629 (Del.Super.1968), we must give deference to the Bankruptcy Court's findings. We agree with the Bankruptcy Judge that when the term of an option is unclear, it is unwise to create terms for the parties. More importantly, however, the ambiguity of the Option term, coupled with Sumerlin's testimony in conflict with the writing on this issue[4], suggests that the Loan Term Sheet was by no means a final agreement containing all essential terms as agreed upon by the parties.

Significantly, it was Pueblo that made requests or demands for the loan guarantee and non-competition agreement from Enterprises after the Loan Term Sheet was written and signed. Although Pueblo points out that it subsequently retracted its demands and waived some of the unresolved issues, the fact that it sought changes to the alleged agreement after the Loan Term Sheet was signed is highly persuasive evidence that it did not believe the agreement was finalized.

■ Further, the only objective manifestations of intent to which Pueblo points are the facts that the Loan Term Sheet was signed by both parties and that it was accompanied by a cover sheet referring to the term sheet as "incorporating the final revisions to which we agreed this morning". However, the mere fact that the Loan Term Sheet was in writing and signed does not prove that the parties intended to be bound by the writing. *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 26 (1957); *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); 1 *Corbin on Contracts*, § 30 (1950); 1 *Williston on Contracts* § 28 (3d ed. 1957).

---

3. Although Pueblo attempts to persuade this Court that the missing and/or controverted terms were immaterial and intended by the parties to be resolved later, this position is unpersuasive. While the Loan Term Sheet expressly provided for further negotiations regarding administrative matters, it is obvious that essential terms of the agreement were unresolved. Although Sumerlin testified before the Bankruptcy Judge that the guarantee issues were "administrative matters", they were actually quite significant and controversial. Sumerlin testified that she thought all of the "administrative matters" were cleared up

during the testimony shows that there were several unresolved issues remaining at that time; possibly as many as thirteen, (Tr. at 44, 64, 66); including the guarantee. (Tr. at 70).

4. Although it might be inferred that the Option would come to exist when the first drawdown occurred and last for the following two years, this was contradicted by Sumerlin's testimony that the option existed from June 30, 1993, when the Loan Term Sheet was first signed. Enterprise offered no evidence on this issue.

As the previous discussion illustrates, the parties were far from reaching a final agreement at that time. Further, the Loan Term Sheet specifically noted that further documentation and administrative matters remained to be completed. These facts, when considered in light of the other circumstances, signify that the parties did not intend the Loan Term Sheet to be the final expression of their agreement. Thus, although the Loan Term Sheet was a written and signed document, tending to evince formality, the more tell-tale facts are found in the missing terms, ambiguous terms, and unresolved negotiations. This was the Bankruptcy Judge's finding and we are inclined to agree with that conclusion.

■ Finally, Pueblo places great emphasis on the testimony of Enterprises' attorney Fitzgerald, in an attempt to show that the outstanding issues were indeed agreed upon. It argues, based upon Fitzgerald's testimony, that the Bankruptcy Judge erred when he concluded that the agreement lacked assent to essential terms. Fitzgerald had testified, in part, that only "legal paperwork" needed to be completed, and that the only significant issue in dispute was the non-competition clause which Pueblo argues it had waived. However, we must remember that questions of fact, including inferences such as credibility, are reviewed under a clearly erroneous standard. The Bankruptcy Judge heard the totality of Fitzgerald's testimony, including his evidence that the non-competition issue was unresolved, that Pueblo's attorneys were to be responsible for redrafting the legal paperwork, which he characterized as extensive, and which was never completed. After considering the entire record, we are not convinced that the Bankruptcy Judge's conclusion that essential terms remained unresolved was clearly erroneous.

## III.  CONCLUSION

Based upon the foregoing discussion, we cannot say that the Bankruptcy Court was clearly erroneous in its findings of fact or mistaken in its conclusions of law when it determined that there was no enforceable contract between these parties. Accordingly, we affirm the Bankruptcy Court's decision in

favor of the debtor, III Enterprises, Inc., V, and against the Appellant, Pueblo Chemical, Inc.