**In re RBGSC INVESTMENT CORP., Debtor.**

**Red Bell Brewing Company and Red Bell Brewery and Pub Company— Headhouse, Inc., Plaintiffs,**

v.

**GS Capital, L.P., Bella's Place, Inc., RBGSC Investment Corp., and Nick Sommaripa, Defendants.**

**Bankruptcy No. 99–31799DAS. Adversary No. 99–0892.**

United States Bankruptcy Court, E.D. Pennsylvania, Philadelphia Division.

Nov. 2, 1999.

---

Walter Weir, Jr., Weir & Partners, Philadelphia, PA, for debtors.

Michael T. Farrell, Post & Schell, P.C., Philadelphia, PA, for Red Bell entities.

Kevin J. Carey, Philadelphia, PA, for Red Bell entities.

Paul B. Maschmeyer, Ciardi, Maschmeyer & Karalis, PC, Philadelphia, PA, for Creditors' Committee.

Kenneth E. Aaron, Buchanan Ingersoll, P.C., Philadelphia, PA, for GS Capital, L.P.

David B. Smith, Philadelphia, PA., for Bella's Place, Inc. and Nick Sommaripa.

George E. Pallas, Cohen, Seglias, Pallas & Greenhall, P.C., Philadelphia, PA, for Debtor in Common Pleas Action.

Jeffrey Meyers, Philadelphia, PA, for Marketplace Redwood, L.P.

Joseph A. Dworetsky, Philadelphia, PA, for Headhouse Retail Associates, L.P.

Joseph DiGiuseppe, Philadelphia, PA, for City of Philadelphia.

Frederic Baker, Philadelphia, PA, Ass't U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

We have before us a number of motions arising out of the bankruptcy case of RBGSC INVESTMENT CORP. ("the Debtor"), the owner of an operating restaurant/pub in the Philadelphia International Airport ("the Airport") and a larger yet-unopened facility at the Reading Terminal Headhouse in downtown Philadelphia ("the Headhouse"), and the above-captioned adversary proceeding ("the Proceeding") removed to this court from the Common Pleas Court of Philadelphia County ("the CCP") by the Debtor. These include (1) a motion by the Debtor in the main case to reject ("the Rejection Motion") a Management Agreement of December 10, 1998 ("the MA"), between Red Bell Brewery to Pub Co.—Headhouse, Inc. ("RBHH"), the Debtor, and its nondebtor affiliate, GS Capital, L.P. ("GS"); (2) a motion of the Red Bell Brewing Co. ("RBBC") and RBHH (collectively "Bell"), the Plaintiffs in the Proceeding, to remand the Proceeding to the CCP ("the Remand Motion"); and (3) motions by the Debtor and by GS; Bella's Place, Inc. ("BP"), the manager of the Airport site; and Nick Sommaripa, the President of the Debtor and BP, the nondebtor defendants in the Proceeding (collectively "the Nondebtors"), to dissolve or vacate ("the Dissolution Motions") (a) a CCP order of August 12, 1999, preliminarily enjoining ("the PI Order") the Defendants from terminating a Lease and Consulting Agreement of May 20, 1998 ("the LCA"), between RBBC and BP; and (b) an order dated September 23, 1999, holding the Nondebtors in contempt of the PI Order ("the Contempt Order").

We will grant the Rejection Motion, finding that it is a free-standing executory contract, and deny the Remand Motion,

because we believe that the Proceeding is, *inter alia,* in substance an assertion of claims against the Debtor and is therefore a nonjury core proceeding. Although we recognize that an Order of October 19, 1999, of the CCP staying the PI Order ("the Stay Order"), is void because it was entered after the Proceeding was removed to this court, we will enter a similar order staying the PI Order and the Contempt Order pending our prompt disposition of the Proceeding, conditioned on the retention of $83,000 security previously deposited by GS to stay execution on the Contempt·Order with this court.

### A. PROCEDURAL AND FACTUAL HISTORY

The Debtor filed the underlying voluntary Chapter 11 bankruptcy case on September 16, 1999. The Rejection Motion followed on September 22, 1999, with a motion of the Debtor seeking to confirm its financing arrangement with GS pursuant to 11 U.S.C. § 364(c) ("the Financing Motion"). At the close of the expedited hearing of October 5, 1999, on these two motions, we denied the Financing Motion without prejudice, finding that the Debtor had not sought funding elsewhere nor established that GS would not fund it without obtaining a post-petition security interest against it, *see In re Aqua Associates,* 123 B.R. 192, 195–96 (Bankr.E.D.Pa.1991), and allowed the parties until October 12, 1999, to brief the Rejection Motion.

The Notice of Removal of the Proceeding from the CCP to this court was filed on September 29, 1999. The Dissolution Motions were filed on October 4, 1999, and October 12, 1999, by the Debtor and the Nondebtors, respectively. Also filed on October 4, 1999, by the Debtor was a Plan of Reorganization ("the Plan") and an accompanying proposed Disclosure Statement ("the D/S"). A hearing on the propriety of the D/S has been scheduled on November 3, 1999.

The Debtor's Dissolution Motion was listed for a hearing on October 13, 1999, the same date as a hearing on a motion of Marketplace Redwood Limited Partnership ("Redwood"), the manager of the Airport for the City of Philadelphia, to obtain relief from the automatic stay to evict the Debtor from the Airport site ("the Redwood Motion") was scheduled. We denied the Redwood Motion immediately after the hearing, finding that Redwood had not established any material lease violations to support its attempt to terminate the Airport Lease on September 13, 1999. However, Bell and the Debtor agreed to continue the hearing on the Dissolution Motions until October 20, 1999, on which date it was agreed that hearings on the Remand Motion, to be filed by October 15, 1999; and a motion of Bell to dismiss this case or convert it to Chapter 7 ("the Dismissal Motion"), filed on October 12, 1999, would also be held.

After the hearings on October 20, 1990, consistent with the comments of the United States Trustee's representative present, we denied the Dismissal Motion. We also accorded the parties until October 27, 1999, to submit briefs or supplemental briefs addressing all of the other outstanding matters.

Apparently unbeknown to the parties on October 20, 1999, the CCP entered the Stay Order on October 19, 1999. The Debtor moved to add the Stay Order to the record before us, which Bell has opposed because (1) that Order is void; and (2) "it is likely that [the CCP] entered the Order due to the failure to complete a briefing schedule in connection with the injunctive relief." On November 2, 1999, we granted this motion, although we did not attribute any weight to the Stay Order in rendering our decision.

The transactions between Bell and the Debtor/GS began on December 5, 1997, when GS, a minority-owned investment company apparently funded in part by the Small Business Administration ("the SBA"), entered into a letter of intent ("LOI") with RBBC, a Philadelphia-based

brewer of specialty beers, organized in 1993. The LOI contemplated a joint venture between GS and RBBC for the purpose of owning and operating restaurant/brew pubs in the Airport and the Headhouse. Pursuant to the LOI, GS was to invest in the enterprise and RBBC was to provide construction oversight and management services. On April 28, 1998, the Debtor was formed to own the restaurant/brew pub entities contemplated by the LOI.

On May 20, 1998, the Debtor and GS entered into a $3,000,000 financing agreement pursuant to which the Debtor has drawn approximately $2.6 million. On May 20, 1998, the Debtor and BP also executed a management agreement pursuant to which Bella's Place agreed to manage the Airport site. That same date, BP and RBBC executed the LCA, for a term of one year, whereby BP and the Debtor would use the Red Bell name and RBBC would provide construction management services, for which RBBC was to be paid a licensing fee based upon the Debtor's earnings at the Airport site.

On May 27, 1998, the Debtor executed a sublease agreement with Redwood for the Airport site. The Airport site opened for business on June 11, 1998, and is still in operation by the Debtor as a Red Bell operation, although the menu has been changed slightly and the sale of beverages other than RBBC's products has been added. Redwood's attempt to terminate the lease was motivated by its perception of the deterioration of the GS/Bell relationship.

On July 15, 1998, the Debtor and Headhouse Retail Associates, L.P. entered into a 15–year lease for a large facility in the Headhouse. Construction has been completed for the Headhouse site, but the establishment has not been opened, apparently because of difficulties in obtaining the liquor license.

The Debtor claims that its relationship with Bell deteriorated because Bell did a poor job on the Airport site construction, leading to additional costs. Bell believes that GS used its good name in the Philadelphia area, arising from its establishment of a small brew pub in the First Union Center and its sales in Veterans Stadium, to give GS a foothold in markets into which Bell seeks to expand, and is trying to push Bell out once this foothold has been achieved.

The parties attempted to settle their differences by way of a December 10, 1998, Settlement Agreement ("the SA"). Pursuant thereto, RBBC, allegedly over its protests, nevertheless agreed to resign from its construction management contract for the Headhouse site. In addition, the LOI was terminated and RBBC agreed to give up its right to convert management fees into an ownership interest in the Headhouse site to the Debtor. The LCA was modified to require that RBBC receive GS's approval before taking any actions at the Airport site. Finally, the MA was also executed on that date.

The MA provides that RBHH will manage the Headhouse site for one year, renewable for successive terms for the duration of the term of the Headhouse lease. RBHH was entitled to be paid a management fee based on the earnings at the Headhouse site; however, no fees have been earned because the site remains unopened.

We have not received very much testimony relative to the reasons that the Headhouse site has not opened. We were advised that RBBC has a "brewery application" pending to allow sales of liquor at the site which is apparently not proceeding forward. The Debtor has purchased a "restaurant license" for the site which it has made application to use there in lieu of the RBBC "brewery application," but this application is allegedly blocked by the pending of the RBBC application for the same site.

Apparently because they believed that RBBC's delinquencies on certain bills at the Airport site had become intolerable,

the Debtor and BP, on March 17, 1999, by their counsel, directed a four-page letter to James R. Bell, RBBC's President ("Mr. Bell"), declaring a defaults under the LCA and MA due, *inter alia*, to RBBC's alleged failure to maintain solvency, its alleged failure to properly monitor and maintain quality operation of the Airport site, and its failure to pay a $75,000 tenant fund fee for the Airport site. When RBBC allegedly failed to cure these defaults, counsel for the Debtor and BP sent a letter of May 3, 1999, to Mr. Bell purporting to terminate the LCA and MA.

In response, Bell commenced the Proceeding in the CCP on May 21, 1999. On June 16, 1999, the CCP entered a consensual order requiring the Debtor and BP to continue to sell Red Bell beer at the Airport site and to use Red Bell beer taps and equipment there in accordance with the LCA. After hearings beginning on July 28, 1999, in which it was stipulated that Bell's solvency would be the sole matter at issue, the CCP entered the PI Order, the day after the hearing was completed and without any supporting reasons, requiring, *inter alia*, the defendants to comply with all their obligations under the MA and LCA. This order was appealed and a stay was requested from the CCP.

On the motion of Bell, the CCP, allegedly without so much as 24 hours notice and after only a colloquy among the parties before it, entered the Contempt Order, dated September 23, 1999, but allegedly not docketed until after the Proceeding was removed on September 30, 1999, again without any accompanying explanation of the reasons for the Order. The Contempt Order directed the defendants to pay $60,000 within five days and $200 for each day thereafter that the defendants remained in violation of the PI Order. On motion of GS we stayed an execution on the Contempt Order upon GS's deposits totaling $83,000 with the Clerk of this court.

We should note that the Plan contemplates the Debtor's sale of both sites and GS's withdrawal from these enterprises. The SA gives Bell an opportunity to purchase the sites which it may be financially unable to exercise. Cynthia Gowdy, GS's President, testified that her desire to withdraw from these transactions stems from cost overruns which have extended GS's assets in a collaboration with a non-minority-run enterprise beyond the SBA's applicable guidelines.

## B. DISCUSSION

### 1. The Rejection Motion Will Be Granted.

Bell presents three arguments opposing the Rejection Motion: (1) the MA is integrated with the several other contracts between the parties, including the LOI, the SA, and the Airport site lease, citing *In re Karfakis*, 162 B.R. 719, 725 (Bankr. E.D.Pa.1993); (2) the motion is premature; and (3) the bankruptcy filing was "in bad faith."

■ Our order of October 20, 1999, denying the Dismissal Motion disposed of the third argument. The Debtor and GS apparently recognize that this court is inclined to the view that rejection of the MA terminates only RBHH's rights to future administrative claims under that document, and does not in and of itself terminate that contract as a whole. *See, e.g., In re Brown*, 211 B.R. 183, 189–91 (Bankr. E.D.Pa.) ("*Brown I*"), *rev'd in part & remanded*, 1997 WL 786994 (E.D.Pa. Nov. 26, 1997) ("*Brown II*"); and *In re West Chestnut Realty of Haverford, Inc.*, 177 B.R. 501, 506 (Bankr.E.D.Pa.1995). However, they nevertheless believe that rejection, at the earliest possible juncture, is necessary to allow RBHH's rejection claim to be fixed in order to determine how it will be treated under the Plan. We fixed a November 30, 1999, claims bar date and confirmation could proceed shortly thereafter. Delay in disposition of the Rejection Motion would only push these dates back. In light of these facts, we do not agree with Bell's argument that resolution of the Motion is in any sense premature.

■ Bell's primary authority on the issue of the nature of divisibility of the MA from the parties' other contracts, *i.e., Karfakis, supra,* 162 B.R. at 725, states as follows:

In discussing the divisibility of contractual agreements, the Pennsylvania Supreme Court said "[t]he primary inquiry in resolving this question is whether the language employed in the contract clearly indicates the intention of the parties that the contract of the parties be entire or severable." *Heilwood Fuel Co., Inc. v. Manor Real Estate Co.,* 405 Pa. 319, 327, 175 A.2d 880, 884 (1961). If the language of the parties' written agreement does not make their intention clear, the court should seek other aids; for example, the court can use practical interpretation and consider the parties' construction of the agreement as evidenced by their conduct. *Id.*

In the instant case, the evidence established that the Franchise Agreement and the Lease are inextricably interwoven and for all practical purposes comprise a single contractual relationship. Aside from being coterminous and containing cross default provisions, it is readily apparent that one agreement is of no utility without the other. The Franchise Agreement permits the Debtor to operate a specific Franchise Store at a specific location which is simultaneously leased to the Debtor/Franchisee by a Dunkin' Donuts affiliate as Lessor. . . . (footnote omitted).

Applying this test, we find that the MA is not so interwoven with certainly the LOI (which was superseded by the SA) and the Airport lease (which involves a difficult facility and different parties). Nor do we believe that it is indivisible from the SA. The SA purports to be a global resolution of all of the parties' differences. The MA is one aspect of that resolution, as to the Headhouse site. It may be that rejection of the MA also invalidates the SA. However, Bell is not arguing that the Debtor is unfairly attempting to enforce the remain-der of the SA against it while rejecting the MA. Rather, it is apparently arguing that, since it contends that the LOI and Airport lease are among the contracts integrated with the MA, rejection of the MA is inconsistent with the Debtor's assumption of any of its contracts with or affecting Bell entities. *Karfakis* stands for no such principle.

■ As in *Brown, supra,* 211 B.R. at 188, we have little difficulty in finding that the MA is an executory contract, *see also In re Columbia Gas System, Inc.,* 50 F.3d 233, 238 (3d Cir.1995), and that rejection of the MA satisfies the low-threshold "business judgment" test. *See also In re III Enterprises, Inc. V,* 163 B.R. 453, 469 (Bankr.E.D.Pa.), *aff'd,* 169 B.R. 551 (E.D.Pa.1994). Whether rejection, contrary to what we found in *Brown I,* does in fact invalidate the MA is an issue which we do not decide at this time, although we would observe that this result may follow. *See Government Guarantee Fund of Republic of Finland v. Hyatt Corp.,* 95 F.3d 291, 300–07 (3d Cir.1996) (management contract constitutes an agency relationship which cannot be specifically enforced); *Brown II, supra;* and *In re Cloyd,* 238 B.R. 328, 334–35 (Bankr.E.D.Mich.1999).

### 2. The Remand Motion Must Be Denied.

■ Bell argues that the Proceeding should be remanded to the CCP because it involves state law issues implicating the Nondebtors as well as the Debtor, and that Bell may exercise a supposed right to a jury trial which they are unlikely to consent to have this court hear, *see* 28 U.S.C. § 157(e), citing principally *In re Martin,* 1992 WL 144297 (Bankr.E.D.Pa. June 16, 1992); and *In re RCS Properties, Inc.,* 1992 WL 22190 (Bankr.E.D.Pa. Feb. 3, 1992).

*Martin* involved a removal of two lawsuits, which, while the nondebtor parties did assert some claims against the debtors, principally involved claims of the debtors *against* nondebtors, the latter of whom

had demanded jury trials in defense. The debtors ultimately obtained a $150,500 jury verdict against the nondebtors. *See In re Martin,* 91 F.3d 389, 392 (3d Cir. 1996). We expressed some regret about our 1992 decision to remand in *Martin,* which delayed administration of the case for several years, in *In re Gorski,* 1996 WL 509618, at *3 (Bankr.E.D.Pa. Sept. 4, 1996). We are not prompted by this experience to delay the instant case in the same fashion.

*RCS* involved an attempt by nondebtors to remove from state court, post-judgment, thirteen cases brought against only the nondebtor guarantors of the debtor's obligations. The removed proceedings were remanded because they sought to utilize this court to obtain relief from final state court judgments and because the debtor was not a party to them. 1992 WL 22190, at *1–*2. *See also In re Joshua Slocum, Ltd.,* 109 B.R. 101, 106–07 (E.D.Pa.1989) (matter removed by non-plaintiff in action targeting the debtor's non-debtor board members was remanded).

The instant Proceeding asserts claims against the Debtor, as well as against the Nondebtors. It therefore is in substance a proof of claim. *See In re Labrum & Doak, L.L.P.,* 1999 WL 138875, at *6–*9 (Bankr. E.D.Pa. March 11, 1999) (proceedings which nominally asserted claims against nondebtor partners, which were in substance claims against the debtor, were core); *In re LaBrum & Doak, L.L.P.,* 1998 WL 233749, at *3 (Bankr.E.D.Pa. May 8, 1998) (filing counterclaims against debtor rendered proceeding core); *In re Brown,* 219 B.R. 373, 381 (Bankr.E.D.Pa.1998) (same); *In re Pocono Springs Co.,* 1997 WL 695617, at *2–*3 (Bankr.E.D.Pa. Nov.6, 1997) (same); *In re Lloyd Securities, Inc.,* 156 B.R. 750, 742–55 (Bankr. E.D.Pa.1993) (same); and *In re FRG, Inc.,* 121 B.R. 710, 713–16 (Bankr.E.D.Pa.1990) (adversary proceeding against debtor's predecessor and affiliates was found to be in substance a "claim" against the debtor subject to the bar date). As such, the instant proceeding is core. *See In re Meyertech Corp.,* 831 F.2d 410, 417–18 (3d Cir.1987); *Labrum & Doak, supra,* 1999 WL 138875, at *8–*9; and *Brown, supra,* 219 B.R. at 381. Hence, whether Bell does or does not ultimately file formal proofs of claim or has or has not otherwise waived its right to a jury trial, no right of Bell to a jury trial in the Proceeding exists. *See In re Labrum & Doak, LLP,* 225 B.R. 93, 97 (Bankr.E.D.Pa.1998); *Brown, supra,* 219 B.R. at 381; *Pocono Springs, supra,* 1997 WL 695617, at *2–*3; and *Lloyd Securities, supra,* 156 B.R. at 752–55.

The Proceeding is clearly not, like *Martin* or even *Labrum & Doak, Brown, Pocono Springs,* or *Lloyd Securities,* primarily an action *by* a debtor *against* non-debtors, in which the mere filing of counterclaims rendered the proceedings core. It is not an attempt to remove state court actions in which final orders have been entered, or which involve only nondebtors, as in *RCS.* See page 543 *supra.* To the contrary, the Proceeding presents to this court for determination, expeditiously as is necessary to the confirmation process, a dispute of substantial potential significance to that process.

In making the foregoing statement regarding the importance of Bell in this case, we nevertheless do not agree that it is the only other interested party in this case and that the Proceeding presents the only or even the principal issue which must be resolved in this case, and that therefore this case is in substance a mere two-party dispute. The Debtor's dispute with Redwood is also very significant and very real, as exemplified in Redwood's appeal of our denial of its motion to seek relief from the stay to terminate the Debtor's Airport lease. In fact, Redwood's actions appeared to be the single event which triggered this filing. There is also an active Creditors' Committee, whose prospective counsel joined in opposing the Remand Motion. Furthermore, we reject Bell's assertion that, even were this case centered exclusively on a two-party dispute, it would

for that reason be deemed improperly brought to this court.

However, given both its core status and its importance to the Debtor's reorganization, we conclude that the Proceeding has been most appropriately brought to this court and should therefore not be remanded to the CCP.

### 3. The Dissolution Motions Will Be Resolved by Our Stay of the PI Order and Contempt Order, Conditioned on the Security Already Posted by GS.

Bell argues that we should deny the Dissolution Motions because (1) they are effectively untimely motions to reconsider the PI Order and the Contempt Order. *See* Federal Rule of Bankruptcy Procedure 9023, incorporating Federal Rule of Civil Procedure 59(e); (2) the CCP Orders are entitled to full faith and credit under 28 U.S.C. § 1738 and/or *res judicata* and collateral estoppel effect, citing *Public Service Mutual Ins. Co. v. Cohen*, 616 F.2d 704, 707 (3d Cir.1980); and (3) the CCP's decisions were correct, because RBBC is not and was not, at all pertinent times, insolvent and therefore was entitled to injunctive relief enforcing the LCA.

The Debtor effectively answers both the first and second arguments of Bell by pointing out that 28 U.S.C. § 1450 expressly authorizes a federal court to which a former state court action is removed to dissolve or modify a state court injunction or other order which is outstanding in the case when it is removed at any time. *See, e.g., Granny Goose Foods, Inc. v. Brotherhood of Teamsters, etc.,* 415 U.S. 423, 434–40, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974); *Resolution Trust Corp. v. Nernberg,* 3 F.3d 62, 67–69 (3d Cir.1993); *Hyde Park Partners, L.P. v. Connolly,* 839

F.2d 837, 842 (1st Cir.1988); and *Resolution Trust Corp. v. Security Town Co.,* 745 F.Supp. 1216, 1220–22 (E.D.La.1990).

Assuming *arguendo* that full faith and credit or *res judicata*/collateral estoppel were an issue, the PI Order and Contempt Order were clearly not "final orders" entitled to preclusive effect under controlling Pennsylvania law. *See Pennsylvania Turnpike Comm'n v. McGinnes,* 169 F.Supp. 580, 582–83 (E.D.Pa.1958), *rev'd on other grounds,* 268 F.2d 65 (3d Cir.), *cert. denied,* 361 U.S. 829, 80 S.Ct. 78, 4 L.Ed.2d 71 (1959); and *In re Appeal of Little Britain Twp., etc.,* 651 A.2d 606, 610–12 (Pa.Cmwlth.1994). Neither *res judicata* nor collateral estoppel attaches in the absence of a final state court order. *See e.g., In re Bova,* 211 B.R. 803, 809–10 (Bankr.E.D.Pa.1997).[1]

The issue of whether we should proceed to dissolve or vacate the PI Order and the Contempt Order is the most difficult issue before us. We have heard much testimony relevant to this issue and we have reviewed at least part of the CCP record. The underlying substantive issue of Bell's rights under the LCA appears to be a very close one on its merits, particularly if it is distilled to the issue of Bell's solvency in early 1999. We certainly attach some significance to the CCP's unexplicated but decisive orders in favor of Bell.

We are somewhat at a loss as to how to measure the significance of the Stay Order because we have no explanation as to why it was entered. As it was entered well after the Proceeding was removed to this court, it is clearly void in any event. *See In re United Church of the Ministers of God,* 74 B.R. 271, 276 (Bankr. E.D.Pa.1987). We therefore attach no weight to it.

1. Coincidentally *Bova* involved a situation where the same CCP judge as that who entered the PI and Contempt Orders at issue here, then known by another name, entered an order in a case related to a matter before this court while we were in the process of deciding the preclusive effects of prior orders of that court. *See id.* at 808–10. That order was not void, however, because it was entered in the matter in state court after relief from the automatic stay had been granted.

However, the prerequirements for the entry of a preliminary injunction, *see Albee Homes, Inc. v. Caddie Homes, Inc.,* 417 Pa. 177, 181, 207 A.2d 768, 770 (1965); *cf. Nutrasweet Co. v. Vit–Mar Enterprises, Inc.,* 176 F.3d 151, 153 (3d Cir.1999); and *In re Beverage Enterprises, Inc.,* 1997 WL 177352, at *2 (Bankr.E.D.Pa. April 7, 1997), *i.e.,* a strong case on the merits, irreparable harm to the movant if relief is denied, relatively less harm to others, and consideration of the public interest, are demanding.

We note that the PI Order at issue specifically enforced the LCA with a mandatory preliminary injunction, thereby preliminarily specifically enforcing RBBC's alleged rights. As we stated in *Beverage Enterprises, supra,* at *3,

> [i]n *Acierno [v. New Castle County],* the court observes, 40 F.3d [645,] at 653 [(3d Cir.1994)], that
>
> > "[a] party seeking a mandatory preliminary injunction will alter the status quo bears a particularly heavy burden in demonstrating its necessity. *Punnett v. Carter,* 621 F.2d 578, 582 (3d Cir.1980)."
>
> *See also, e.g., Taylor v. Freeman,* 34 F.3d 266, 269 (4th Cir.1994); *Stanley v. University of Southern California,* 13 F.3d 1313, 1320 (9th Cir.1994); and *United States v. Price,* 688 F.2d 204, 211–13 (3d Cir.1982).
>
> The irreparable harm prong is difficult to satisfy in any circumstances....

The *Hyatt* decision is persuasive authority that RBBC is not entitled to an injunction, even if it were proven that the defendants violated the terms of the LCA in terminating it. Bell's attempts to distinguish *Hyatt* are not accompanied by any contrary authority and are unconvincing.

We are hesitant to dissolve or vacate the PI Order and Contempt Order, as the Debtor and the Nondebtors request. The Stay Order, although not a factor in our decision, prompts us to consider the less intrusive step of simply staying these Orders until we hear the Proceeding on its merits, secured by the $83,000 sum already posted by GS to stay execution on the Contempt Order. We shall proceed in this fashion in our following order.

### D. Conclusion

An order consistent with our conclusions in this Opinion will be entered.