**In re RBGSC INVESTMENT CORP., Debtor.**

**Red Bell Brewing Company and Red Bell Brewery and Pub Company— Headhouse, Inc., Plaintiffs,**

**v.**

**GS Capital, L.P., Bella's Place, Inc., RBGSC Investment Corp., and Nick Sommaripa, Defendants.**

**Bankruptcy No. 99–31799DAS. Adversary No. 99–0892.**

United States Bankruptcy Court, E.D. Pennsylvania.

March 15, 2000.

Walter Weir, Jr., Weir & Partners, Philadelphia, PA, for debtors.

Michael T. Farrell, Post & Schell, P.C., Kevin J. Carey, Philadelphia, PA, for Red Bell entities.

Paul B. Maschmeyer, Ciardi, Maschmeyer & Karalis, PC, Philadelphia, PA, for Creditors' Committee.

Kenneth E. Aaron, Buchanan Ingersoll, P.C., Philadelphia, PA, for GS Capital, L.P.

David B. Smith, Philadelphia, PA., for Bella's Place, Inc. and Nick Sommaripa.

George E. Pallas, Cohen, Seglias, Pallas & Greenhall, P.C., Philadelphia, PA, for debtor in Common Pleas Action.

Jeffrey Meyers, Philadelphia, PA, for Marketplace Redwood, L.P.

Joseph A. Dworetsky, Philadelphia, PA, for Headhouse Retail Associates, L.P.

Joseph DiGiuseppe, Philadelphia, PA, for City of Philadelphia.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA, United States Trustee.

## MEMORANDUM

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant decision puts to rest the claims of RED BELL BREWING COMPANY ("RBBC") and RED BELL BREWERY AND PUB COMPANY— HEADHOUSE, INC. ("RBHH;" with RBBC, "the Plaintiffs") remaining against the Defendants, GS CAPITAL, L.P. ("GS"), BELLA'S PLACE, INC. ("BP"), RBGSC INVESTMENT CORP. ("the Debtor"), and NICK SOMMARIPA, after our decisions in In re RBGSC Investment Corp., 240 B.R. 536, 542–44 (Bankr. E.D.Pa.1999) ("RBGSC I "), refusing to remand this proceeding ("the Proceeding") to the state court from which it was removed and, id. at 544–45, staying a preliminary injunction order and a contempt order entered by the state court prior to removal; and in In re RBGSC Investment Corp., 242 B.R. 851 ("RBGSC II "), reconsideration granted in part, 244 B.R. 71 (Bankr.E.D.Pa.2000) ("RBGSC III "), dismissing most of the Plaintiffs' claims. Herein, we proceed to enter a judgment in favor RBBC against BP only in amount of $20,269.11, for unpaid management fees in an agreed amount of $18,913.11, and $1256 due for sales of wearable items, as RBGSC II portended, 242 B.R. at 864, would be the likely result. In so doing, we reject the claims asserted after our dismissal of the defamation claim on February 2, 2000, namely (1) a "restitution" claim for $2,283,-630(!) and (2) a claim against GS seeking to render it liable for all claims against the other Defendants on the ground that it tortiously interfered with contracts between the Plaintiffs and, respectively, the Debtor and BP.

We also will grant in part only the motion ("the Motion") of GS to retain the $83,000 deposit posted by it per our order of October 22, 1999, and continued in effect per RBGSC I, 240 B.R. at 545, directing that $20,169.11 of this sum be paid to the Plaintiffs before refunding the balance of $62,830.89 to GS. Finally, we will sustain the Debtor's objections ("the Objections") to the Plaintiffs' claims filed against it in this bankruptcy case.

### B. ISSUES PRESENTED

The factual and procedural history of the Proceeding are recited, through the dates of those decisions, at some length in RBGSC II, 242 B.R. at 855–57; and RBGSC I, 240 B.R. at 539–41, and will not be repeated here. Picking up thereafter, the trial of the claims remaining after our decision in RBGSC II, scheduled in the order accompanying that Opinion for January 26, 2000, 242 B.R. at 865–66, along with the hearings on the Motion and the Objections, was pushed back to January 28, 2000, and February 2, 2000, by a snow storm. As we noted in RBGSC III, 244 B.R. at 72, the Debtor was authorized, by an order of January 6, 2000, to sell its interests in both of its sites to another brew-pub whose offer of $2,850,000 and a closing in 45 days the Plaintiffs were unable to meet. This order apparently rendered moot the Debtor's counterclaim asserted in the Proceeding seeking to enjoin the Plaintiffs from interfering with its liquor license application for the Debtor's site at the Headhouse of the Reading Terminal in Center City, Philadelphia ("the Headhouse Site").

The only new testimony was the recitation by the Plaintiffs' principal, James R. Bell, and its managing director, Robert T. Huttick, of the following components of their "restitution" claim:

$700,000 for the value of the Headhouse lease which Red Bell provided, negotiated and signed;

$120,000 for the value of the Airport lease which Red Bell also provided;

the $656,000 dollars received by the Debtor and GSC which Red Bell caused the Redevelopment Authority ("RDA") to contribute as "tenant improvement" money;

the $769,800 in "shell improvements" which the RDA agreed to contribute to the Headhouse project as a result of Red Bell's efforts;

$12,830, which represents the reduction in the common area maintenance ("CAM") charges negotiated by Red Bell; and

the $25,000 to $50,000 value of Red Bell's services in creating and designing the concept for a brew pub at the Reading Terminal.

Post Hearing Brief Re: Assessment of Remedy Due To Red Bell Brewing Company And Red Bell Brewery and Pub Company—Headhouse ("Opening Brief"), at 3.

The Plaintiffs' general theory supporting their principal claims in the Proceeding is that, since they offered these contributions to the enterprise formed by it and GS to own and operate brew-pubs at the two sites leased by the Debtor, in the Philadelphia International Airport ("the Airport Site") and in the Headhouse, they were entitled to recover these sums on the basis "restitution." [1]

Their remaining claims in the Proceeding, are asserting against GS and are substantially based on the tort of intentional inference with the business relationships ("the Tort") between the Plaintiffs and, respectively, the Debtor and BP. The Tort claims seek to render GS liable for any liability imposed upon the Debtor and BP on the ground that GS caused the co-defendants, its affiliates, to take the actions which allegedly rendered them liable to the Plaintiffs.

The Defendants' responsive brief makes, *inter alia*, the following counter-arguments:

1. The Plaintiffs released the Defendants per recitations in the parties' Settlement Agreement of December 10, 1998 ("the SA").

2. The parol evidence rule bars the Plaintiffs' claims based on negotiations prior to execution of the SA and the other operative contracts between the parties, the License and Consulting Agreement of May 20, 1998 ("the LCA"), relating to the Airport Site, and the Management Agreement of December 10, 1998 ("the MA"), relating to the Headhouse Site.

3. The Plaintiffs were unable to prove that the Defendants benefitted from the activities which constituted the components of their restitution claim, recited at pages 809–10 *supra*, since the Sites were sold for an amount less than GS invested in the enterprise.

4. The Tort claims are barred because GS at all times acted in good faith to protect its interests.

Although the original briefing order contemplated the filing of simultaneous open-

---

**1.** The Plaintiffs argued, at an earlier stage, that they were also entitled to recover damages as a result of the Defendants' actions in contempt of the state court preliminary injunction order even if the preliminary injunction order was subsequently vacated. However, the Plaintiffs have apparently conceded, by not presenting any further argument on the point, that the state court's contempt order, since it was paid to the Plaintiffs rather than to the court, was civil in nature, *see Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 631–32, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988), and the reversal of an injunctive order supporting civil contempt relief abates the damages awarded for its contempt. *Latrobe Steel Co. v. United Steelworkers of America, etc.*, 545 F.2d 1336, 1345–46 (3d Cir.1976); and *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1182 (3d Cir.1976). As we state at page 815 *infra,* and in our accompanying order, the preliminary injunction and contempt orders entered by the state court must be dissolved.

ing and reply briefs one brief by the Plaintiffs and the Defendants, on February 16, 2000, respectively, and March 1, 2000, the Plaintiffs were granted permission during a colloquy at the confirmation hearing on the Debtor's plan on February 23, 2000, which resulted in a confirmation order of that date, to file a reply brief by March 6, 2000. This request was generated by our expression of skepticism, during that colloquy, that relief could be granted to the Plaintiffs on the basis of a restitution theory in light of the absence of evidence of benefit to the Defendants from the Plaintiffs' actions. In their reply brief the Plaintiffs argued that our observations reflected confusion between restitution and unjust enrichment. The plaintiffs therein posited that, while unjust enrichment required a showing of a benefit to the Defendants, "[r]estitution ... is simply a measure of damage for a breach of contract premised upon the need to return to the plaintiff the value of that which it gave up pursuant to the contract." Reply of Plaintiffs To Joint Post–Trial Memorandum of Defendants Regarding Damages ("Reply Brief"), at 12. Thus, they argued that the showing of a benefit to the Defendants was not a prerequisite for the success of their large restitution claim.

## C. *DISCUSSION*

1. *The Plaintiffs' Restitution Claim Fails Because the Plaintiffs Failed to Prove the Requisite Benefit to the Defendants from Their Alleged Contributions to the Parties' Enterprises.*

▮ As we indicated in the colloquy of February 23, 2000, we believed that the Plaintiffs' failure to prove that their actions conferred a benefit upon the Defendants by their activities recited at pages 809–10 *supra* was fatal to their restitution claims. We do not agree with the Plaintiffs that any of the authorities which they cite for the principle that restitution allows the damages for a breach of contract based upon the value of that which the plaintiff "gave up" or contributed to a contracted enterprise without regard to the benefits or lack thereof provided to the defendant, support any such principles, *e.g., ATACS Corp. v. Trans World Communications,* 155 F.3d 659, 669–71 (3d Cir.1998); *Baker v. Cambridge Chase, Inc.,* 725 A.2d 757, 766 (Pa.Super.1999), *appeal denied,* 745 A.2d 1216, 1999 WL 796593 (Pa. Oct. 5, 1999); A. CORBIN, CORBIN ON CONTRACTS, § 1112, at 596–97 (1964) ("Corbin"); and RESTATEMENT (SECOND) OF CONTRACTS, § 373 to comment a, at 208–09 (1981) ("the Restatement"),

It is true that the Restatement comment identifies restitution as an "alterative remedy for breach" of a contract. *Id.* at 204. However, that does not mean that the Restatement supports the notion that what the plaintiff gave up rather than whether the defendant benefitted can be the sole consideration in determining whether restitution may appropriately be awarded in a given situation. Indeed, a few sections earlier, in reciting the most basic principles relative to restitution, the Restatement states as follows:

**§ 370. Requirement That Benefit Be Conferred**

> **A party is entitled to restitution under the rules stated in this Restatement only to the extent that he has conferred a benefit on the other party by way of part performance or reliance.**

Comment:

> a. Meaning of requirement. A party's restitution interest is his interest in having restored to him any benefit that he has conferred on the other party....

Restatement, § 370 & comment a, at 200.

The citation of Corbin as authority for the Plaintiffs' theory regarding restitution is similarly misplaced. The quotation favored by the Plaintiffs does not, in itself, support the Plaintiffs' contention that what they gave up to the Defendants is the measure of damages, but rather it recites that "the reasonable value of the past per-

formance rendered," Corbin, § 1112, at 596, is the measure. The Plaintiffs presented neither expert nor any other testimony that the components of their restitution claims cited at pages 809–10 *supra* had any value whatsoever. Nor were the Site leases in their raw, undeveloped state proven to have *any* value.

However, assuming *arguendo* that value of the contribution of the Plaintiffs to the brew-pub enterprises had been proven, Corbin points out in a section a few pages prior to that quoted by the Plaintiffs as follows:

**§ 1107. Restitution Requires the Return to the Injured Party of Value that the Wrongdoer has Received.**

The remedy of restitution differs from the remedy in damages in that in awarding damages the purpose is to put the injured party in as good a position as he would have occupied, had the contract been fully performed, while in enforcing restitution, the purpose is to require the wrongdoer to restore what he has received and thus tend to put the injured party in as good a position as that occupied by him before the contract was made. Ordinarily, restitution requires that the defendant shall give something back to the plaintiff; and it may be supposed that the defendant cannot do this unless he has received something of value at the plaintiff's hands (footnote omitted).

. . .

If, however, the plaintiff has not yet rendered any part of the performance for which the defendant bargained, but has merely incurred labor and expense in preparation to render the requested performance, resulting in no actual advantage or enrichment to the defendant, no remedy by way of restitution is available to the plaintiff. . . .

Corbin, ¶ 1107, at 573, 574.

■ Nothing in the *ATACS* nor the *Baker* opinion contradicts the well-estab-

lished black-letter law that disgorgement of benefits received by the defendant due to the plaintiff's actions is the touchstone of restitution. Thus, in *ATACS*, 155 F.3d at 669, the court states that

restitution damages will require the party in breach to disgorge the benefit received by returning it to the party who conferred it. *See Trosky [v. Civil Service Comm'n*, 539 Pa. 356, 652 A.2d 813, 817 (1995)]. Pennsylvania courts will look to traditional principles of equity, such as unjust enrichment or forfeiture, in considering the propriety of restitution damages. *See [Fidelity Fund, Inc. v.] DiSanto*, [347 Pa.Super. 112, 500 A.2d 431, 438–39 (1985)]. . . .

■ The discussion of restitution in *Baker*, 725 A.2d at 766–67, appears in the context of a rescission, which appears totally inapplicable to the case at bar, which does not involve a rescission. Similarly, all of the prior decisions of this court dealing with the concept of restitution emphasize the significance of evidence that the defendant benefitted from the plaintiff's actions as a prerequisite for any such claims. *See In re Labrum & Doak, LLP*, 225 B.R. 93, 105 (Bankr.E.D.Pa.1998); *In re Bey*, 1990 WL 5315, at *4 (Bankr.E.D.Pa. Jan. 26, 1990); *In re Summit Airlines, Inc.*, 94 B.R. 367, 370 (Bankr.E.D.Pa.1988); and *In re Tubular Products, Inc.*, 69 B.R. 582, 585 (Bankr.E.D.Pa.1987).

Therefore, assuming, again *arguendo*, that the Plaintiffs had evaded all of the Defendants' other defenses, specifically the release issue and the parol evidence rule, there is no evidence in the instant record which could support a claim of damages measured under principles of restitution because there is no evidence that this enterprise conferred any benefit upon the Defendants. Indeed, the evidence of record establishes that their investment in this enterprise was over $3.5 million and the sale price was less than $2.9 million. The profits realized from the only operating facility at the Airport Site did not approach an offset for these losses. There

was evidence that the package of assets which the Plaintiffs generated were not of significant value because the lease terms at the Headhouse Site were too onerous to attract many prospective replacement tenants. Thus, just because the concessions received and alleged lease benefits which the Plaintiffs obtained could be related to certain dollar figures has no relationship to their value. For all the record shows, the concessions may have been much less than they reasonably should have been in these circumstances.

The only damages which will be allowed to the Plaintiffs are therefore the $20,-169.11 representing the amounts due to RBBC from BP under the LCA which were unpaid due to (1) the attempted premature termination of this contract, and (2) for uncompensated wearables. *See RBGSC II,* 242 B.R. at 862-64. As we also noted there, comparable damages cannot be recovered for breach of the MA under which the Headhouse Site was to operate because that Site never opened prior to the cutting off of the interests of the Debtor and the Plaintiffs through the sale of the Debtor's assets, including the lease for this Site, particularly when we found the Plaintiffs in substantial part responsible for the failure of the Headhouse to open. *Id.* at 862. We also note that the Plaintiffs were accorded a clear opportunity to acquire the Debtor's assets for themselves by making a higher and better offer during sale process, but they failed to do so. *See RBGSC III,* 244 B.R. at 72.

2. *To the Extent that The Plaintiffs' Claims Are Based on Alleged Contractual Rights, the Release of All Claims in the SA and the Parol Evidence Rule Bar Same.*

■ Although the Plaintiffs presently have articulated their claims as based upon violations of the LCA and the MA, this is largely because we clearly eliminated all claims based on alleged contractual and quest contractual arrangements which preceded the SA, LCA, and MA in *RBGSC II,*

242 B.R. at 857-58. To the extent that any glimmer of claims based on the parties' precontractual state remain, the Defendants' defenses based on the comprehensive releases contained in the SA and the operation of the parol evidence rule eliminate same.

■ As this court recognized in *In re FRG, Inc.,* 121 B.R. 451, 457 (Bankr. E.D.Pa.1990),

The law of Pennsylvania, ... does not suggest niggardly treatment of releases:

"Pennsylvania law is clearly that where the parties manifest an intent to settle all accounts, the release will be given full effect even as to unknown claims (footnote omitted)."

*Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885, 896 (3d Cir.1975).

The broad releases in the SA clearly eliminate any claims based on written or oral agreements which preceded it.

■ The Plaintiffs are mistaken when they attempt to avoid the Defendants' parol evidence rule argument by characterizing this rule as one referencing merely "admissibility of evidence." Reply Brief, at 21. Rather,

[t]he parol evidence rule is a rule of substantive law which prevents adding terms to a written contract which arose from [prior or] contemporaneous oral agreements of the parties to the contract. *See, e.g., Globe Motors, Inc. v. Studebaker–Packard Corp.,* 328 F.2d 645, 649 (3d Cir.1964); *Harrison [v. James,* 558 F.Supp. 438,] 442–44 [(E.D.Pa.1983)]; *Keyser v. Margolis,* 422 Pa. 553, 559, 223 A.2d 13, 16–17 (1966); *Keleher v. LaSalle College,* 394 Pa. 545, 552, 147 A.2d 835, 839, *cert. denied,* 361 U.S. 12, 80 S.Ct. 66, 4 L.Ed.2d 50 (1959); and *Knirnschild v. Pittsburgh Brewing Co.,* 390 Pa. 606, 136 A.2d 316, 319 (1957).

*In re Johns,* 1990 WL 61765, at *2 (Bankr. E.D.Pa. May 8, 1990).

To the extent that the Plaintiffs rely on any alleged agreements which pre-dated the SA, LCA, and MA—and Bell, in his testimony, seemed inclined to do so despite our rulings in *RBGSC II*, 242 B.R. at 857–58—the validity of the releases contained in the SA and the parol evidence rule would eliminate same.

3. *The Plaintiffs' Claims Against GS Based on its Alleged Interference with the Plaintiffs' Contractual Relationships with the Debtor and BP, Are Lacking in Merit and Are Rendered Unnecessary in Light of That Aspect of Our Order Directing Payment of BP's Obligation to RBBC Out the Money Deposited into this Court by GS.*

■ Remaining for consideration are the Plaintiffs' claims based on the Tort. The Plaintiffs gave much less attention to these claims than those based on restitution. As a result, the contours of the Plaintiffs' claims based on this cause of action are not totally clear. However, the Plaintiffs' statements that their claims attempt to hold GS liable for their valid claims against the Debtor and BP, Opening Brief, at 17–18, make it appear that these claims are strictly derivative of their claims against the Debtor and BP.

As a result, the Plaintiffs' claims based on the Tort appear limited, in light of determination that the only valid claim against the Defendants is a $20,169.11 against BP alone for its breaches of the LCA and an oral contract regarding wearables at the Airport Site.

The only practical purpose served by a decision holding GS jointly liable with BP for this sum would appear to be to increase the Plaintiffs' opportunities for collection of the $20,169.11 amount awarded to them against BP. The collectibility of a judgment against BP presents a nice question, because the sale of the only assets in which it had a stake, the brew-pub Sites previously owned by the Debtor, apparently renders BP a shell. However, that as-

pect of our following order which carves out the $20,169.11 judgment from the funds deposited by GS in deciding the Motion effectively resolves this issue in the Plaintiffs' favor.

■ However, because there may be some residual claims asserted against GS based on the Tort, we will briefly discuss the substance of such claims. Both parties cite numerous cases setting forth the elements of the Tort. Since the cases cited by the Defendants, *e.g., Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1388 (3d Cir.1991); *Center for Concept Development v. Godfrey*, 1999 WL 163006 at *2 (E.D.Pa. March 23, 1999); *National Data Payment Systems, Inc. v. Meridian Bank*, 18 F.Supp.2d 543, 549 (E.D.Pa.1998), recite fewer proof requirements than the six referenced in the authority cited by the Plaintiffs, *SDK Investments, Inc. v. Ott*, 1996 WL 69402, at *12 (E.D.Pa. Feb. 15, 1996), we will accept the Plaintiffs' recitation of the following elements which must be proven to prevail in such a claim:

(1) an enforceable contract existed between [the plaintiff] and a third party; (2) that the tortfeasor had knowledge of the contract between the plaintiff and the third-party; (3) that the tortfeasor knew he was interfering with the performance of that contract; (4) that the tortfeasor induced or caused the third-party to breach the contract with the plaintiffs; (5) that the tortfeasor intended to harm the plaintiff by interfering with the contract; and (6) that the tortfeasor's conduct was not privileged or justified.

Opening Brief, at 18. *See also Labrum & Doak, supra*, 225 B.R. at 110, citing *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 530 (3d Cir.1998).

The principal defense of the Defendants is a reiteration of our statements in *RBGSC II*, 242 B.R. at 860, that the Defendants "engaged in reasonable effects to extricate themselves from transactions in

which they intended to perform, but which had gone sour, as they had a perfect right to do," which they argue supports the conclusion that their actions were privileged and/or justified. We agree. *See also id.* at 865 ("In such circumstances, a breach of any contractual relationships might be deemed an efficient one for both parties, thus mitigating any damages due to the Plaintiffs. *See Paolella v. Browning–Ferris, Inc.,* 973 F.Supp. 508, 515 (E.D.Pa. 1997), *aff'd,* 158 F.3d 183 (3d Cir.1998).").

We also believe that the Plaintiffs' opportunity to provide a higher and better offer than the ultimate purchase terms at the hearing on the Motion to sell the Debtor's assets on January 6, 2000, gave the Plaintiffs a clear chance to mitigate, if not eliminate, their damages from allegedly being wrongfully forced out of the Sites at issue. We find that the Plaintiffs' failure to make a better and higher offer arose from a financial inability to do so and not from either unwillingness or lack of a fair and clear opportunity to do so. The lack of financial ability to make this deal suggests that, if the Plaintiffs are not insolvent, they are far from financially robust. As we suggested in *RBGSC III,* 244 B.R. at 72; and *RBGSC II,* 242 B.R. at 863, the issue of the Plaintiffs' insolvency was a very close call.

4. *The Debtor's Objections to the Plaintiffs' Proof of Claim Are Sustained; the Injunction and Contempt Orders Are Dissolved; and GS Will Be Permitted to Recover the Balance of its $83,000 Deposit after RBBC's Judgment Is Satisfied.*

The parties did not so much as mention in their respective briefs that also before the court are the Debtor's Objections to the Plaintiffs' joint proof of claim in the amount of $9,728,227.70, plus other unliquidated sums. On January 12, 2000, in accordance with our discussions in *RBGSC II,* 242 B.R. at 861–63, we estimated the Plaintiffs' claims against the Debtor, for purposes of voting on the Debtor's plan, at

zero (0). No basis to alter this estimate in finally measuring the Plaintiffs' valid claims against the Debtor was proven at the trial/hearing. Therefore, the Objections will be sustained, and the Claim will be stricken in its entirety.

The dissolution of the preliminary injunction order and the contempt order entered by the state court prior to the remand of the Proceeding follows from our decision in *RBGSC II,* 242 B.R. at 862, 864–65. As a result, the Motion, which the parties also failed to mention in their briefs, must be granted. However, as the $83,000 posted by GS was arguably security to stay the enforcement of valid judgments against any of the Defendants, we will deduct the $20,169.11 valid judgment entered herein against BP from the amount deposited, making that sum payable to RBBC, and order a refund of only the balance of $62,830.89 to GS.

### D. CONCLUSION

For the foregoing reasons, we enter the following order.