**In re RBGSC INVESTMENT CORPORATION.**

**No. CIV.A. 00–2201.**

United States District Court, E.D. Pennsylvania.

Sept. 25, 2000.

Walter Weir, Jr., Bonnie R. Golub, Weir and Partners, Philadelphia, PA, for debtor.

Michael T. Farrell, Post and Schell, P.C., Philadelphia, PA, for appellants.

Paul B. Maschmeyer, Philadelphia, PA, for creditor.

Kenneth E. Aaron, Jami B. Nimeroff, Buchanan, Ingersoll Professional Corporation, David B. Smith, Philadelphia, PA, for Interested Parties.

Frederick J. Baker, Philadelphia, PA, United States Trustee.

## MEMORANDUM

DALZELL, District Judge.

We here consider an appeal from an Order of the United States Bankruptcy Court for the Eastern District of Pennsyl-

vania dated March 22, 2000 and entered in Bankruptcy No. 99–31799DAS.

## I. Background

### A. Facts

This appeal, and indeed the entire bankruptcy from which it stems, arises from a sophisticated set of arrangements entered into by a group of business entities regarding the construction and operation of two brew pubs, one to be located at the Philadelphia International Airport, and one to be located at the Reading Terminal Headhouse in Center City Philadelphia. The Debtor in this case, RBGSC Investment Corporation, was a joint venture formed by, *inter alia*, GS Capital, L.P., a venture capital entity, to own brew pubs that Red Bell Brewing Company ("Red Bell"), a brewing concern, would manage.

We will not attempt here to recapitulate the totality the complex history of the business relationships among these entities, and instead refer for additional background to the descriptions laid out in the four published opinions the Bankruptcy Court issued in this case: *In re RBGSC Inv. Corp.*, 240 B.R. 536 (Bankr.E.D.Pa. 1999) ("*RBGSC I*"); *In re RBGSC Inv. Corp.*, 242 B.R. 851 (Bankr.E.D.Pa.2000) ("*RBGSC II*"); *In re RBGSC Inv. Corp.*, 244 B.R. 71 (Bankr.E.D.Pa.2000) ("*RBGSC III*"); and *In re RBGSC Inv. Corp.*, 245 B.R. 807 (Bankr.E.D.Pa.2000) ("*RBGSC IV*"). It is nevertheless impossible to understand the disputes among the parties here without a canvass of the complex factual background. For present purposes, then, we will sketch an outline of the underlying facts.[1]

On December 5, 1997, Red Bell and GS Capital entered into a letter of intent ("LOI"), which formed the basis for the relationship between these two entities. Under the LOI, a joint venture would be formed by GS Capital and a yet-to-be-formed employee stock ownership plan ("ESOP")[2], and this joint venture's purpose would be to own and operate a restaurant and brew pub in the Reading Terminal Headhouse. Under the LOI, the joint venture would itself enter into a management agreement with Red Bell whereby Red Bell would manage the restaurant and brew pub operation, pursuant to a to-be-executed Management Agreement. Under the LOI, the total cash contribution into the project was expected to be $2.3 million, with GS Capital and the ESOP contributing about $1.7 million and the City of Philadelphia contributing about $600,000 as a tenant improvement contribution.

The LOI went on to detail some of the terms and conditions of this proposed Management Agreement, including, among other things, the management fees payable to Red Bell, circumstances under which the Management Agreement could be terminated, and the terms by which Red Bell could, in the future, convert its management fee to a ownership interest. The LOI also stated that the lease for the brew pub premises would be assigned to the joint venture with the consent of the landlord, and further provided that the formation of the joint venture and execution of the management agreement were to take place by March 31, 1998.

RBGSC Investment Corporation ("RBGSC"), the joint venture the LOI contemplated, was incorporated on April 28,

---

**1.** We recognize that the parties have contrary views of many of the factual issues this case presents. The facts we lay out here are intended as a brief guide to the history of the business relationships and ensuing litigation rather than as a definitive set of factual findings; indeed, sitting as we are as an appellate court, such findings would not in the first instance be ours to make. To the extent that the parties' differing views of the facts are relevant to the issues on appeal, we discuss those views (naturally in connection with the Bankruptcy Court's associated findings) where necessary below.

**2.** The LOI also mentions the participation of a group of current or past Philadelphia-associated minority athletes, but this group appears not to have joined in the deal.

1998, with James R. Bell, Red Bell's president, as its sole director. Initially, it seems, James R. Bell was also RBGSC's sole shareholder, *see* Consent in Lieu of First Meeting of Board of Directors at [3], Tab 4, Red Bell Document Binder.[3]

Following RBGSC's incorporation, the parties entered into a network of agreements to effectuate the business plan the LOI outlined. First, three agreements were entered into on May 20, 1998. In the first of these, RBGSC (as borrower) and GS Capital (as lender) entered into a line of credit agreement, by whose terms RBGSC could borrow up to $3 million, at fourteen percent interest, through May 31, 1999. In exchange for the line of credit, GS Capital received as collateral a first lien security interest in RBGSC's assets, including, *inter alia*, RBGSC's accounts, chattel paper, goods, and inventory. As a condition of the line of credit, RBGSC agreed to change its control structure, such that after the execution of the line of credit, the Red Cap, Inc. Employee Stock Ownership Plan would own 50.1% of the outstanding stock, and GS Capital would own 49.9% of outstanding stock, *see* Line of Credit Agreement ¶ 7.5, Ex. 1, GS Capital's Proof of Claim, Tab 3, Supplemental R., Appeal of the Mar. 22, 2000 Order. As it turned out, RBGSC became a wholly-owned subsidiary of Red Cap, Inc., and, in turn, Red Cap, Inc. was owned 49.9% by GS Capital and 50.1% by the ESOP for the employees of Red Cap, Inc. by its fiduciary, Eugene Lefevre.[4]

The second agreement of May 20, 1998 was a Management Agreement pertaining to a retail premises located on the Terminal B–C Connector at the Philadelphia International Airport[5] entered into between RBGSC, GS Capital, and Bella's Place, Inc.[6] This Agreement contemplated that RBGSC would own a restaurant and brew pub at the Airport location and that Bella's

---

**3.** A note on citations is necessary here. Unfortunately, and as noted in our Order of September 15, 2000 consolidating these appeals under C.A. No. 00–2201, the record in this case as it has come up to us is disorganized in the extreme. Particularly vexing is the fact that exhibits used during hearings before the Bankruptcy Court, and referred to by exhibit number both in the transcripts of those proceedings and in the parties' subsequent briefs, are neither grouped together in the record nor indexed in the record by their exhibit number. Moreover, we have before us four separate records (one for each appeal) but each record does not necessarily contain all the documents referred to by the parties in their briefs for that appeal, and, instead, reference is in some circumstances required to the records for other appeals. In order to minimize any subsequent confusion caused by the record, our first citation to any document will include not only its name and, if significant, exhibit number, but also to the place in the record where it can be found.

Also, during the various hearings before the Bankruptcy Court, the parties made repeated reference to documents contained in two "document binders," one containing Red Bell's documents and one containing RBGSC's documents, that were used in hearings before the Bankruptcy Court. Because these are referred to so frequently, we shall cite to them using the shorthand "Red Bell Document Binder" and "RBGSC Document Binder". RBGSC's document binder is located in the record before us as Tab 3 to the Record for the Appeal of the March 15, 2000 order; Red Bell's document binder is Tab 1 to the Supplemental Record for the Appeal of the March 22, 2000 order.

**4.** This ESOP is now "dissolved." Red Cap, Inc. was formed as a holding company to own the brewpubs through RBGSC, *see* Settlement Agreement at 1, Tab A–2, RBGSC's Document Binder. Although, as noted above, James R. Bell was initially the sole director of RBGSC, he testified that he was unaware of exactly when or how the one-hundred percent ownership interest in RBGSC went to Red Cap, Inc., *see* Tr., Oct. 20, 1999 at 130–32, Tab 7, R., Appeal of the Mar. 22, 2000 Order.

**5.** Although the Airport site was not explicitly mentioned in the LOI, the extension of the relationship among the parties to include the operation of the Airport pub was apparently contemplated by the parties from the beginning.

**6.** Bella's Place was formed by Red Cap, Inc. to manage the Airport site and hold the liquor license for that site because Red Bell, pursuant to Pennsylvania law, was unable to hold a restaurant liquor license or manage the Airport site.

Place would develop, manage, and operate the business in exchange for a fee. The Agreement gave GS Capital, as investor, the right to terminate the Agreement for cause, *see* Management Agreement, Tab A–3, RBGSC Document Binder.

The third agreement executed on May 20, 1998 was a License and Consulting Agreement entered into by Red Bell and Bella's Place, Inc., by the terms of which Red Bell gave Bella's Place a license to operate a "Red Bell Brewery and Pub" on the Terminal B–C connector at the Philadelphia International Airport. Under this agreement, Bella's Place received the right to use certain of Red Bell's marks. Red Bell, in exchange for a fee, was responsible for, *inter alia*, working with the architect, supervising the construction of the airport brew pub, and assisting with the operation of the pub, to include assisting in recruitment and training of staff, obtaining the required licenses and permits, and purchasing all food, beverages, and other products necessary for operating the pub, *see* License and Consulting Agreement, Tab A–4, RBGSC Document Binder [7].

On May 27, 1998, RBGSC entered into a sublease with Marketplace Redwood Limited Partnership [8] for the retail location at the Philadelphia International Airport, *see* Sublease Agreement, Tab A–5, RBGSC Document Binder.

On July 15, 1998, RBGSC and Headhouse Retail Associates, L.P., the owner of the Headhouse property, entered into a lease agreement for the Headhouse pub site, *see* Lease Agreement, Tab A–6, RBGSC Document Binder. James R. Bell executed a personal guaranty for this lease, *see* Lease Guaranty, Tab 5, Red Bell Document Binder.

Also on July 15, 1998, RBGSC and Red Bell entered into a Construction Management Agreement with Headhouse Retail Associates. That Agreement recited that RBGSC was the tenant at the Headhouse site, and the Agreement provided that Red Bell would serve as the construction manager for the improvements to be made to the property pursuant to its occupancy as a brew pub, *see* Construction Management Agreement, Tab 6, Red Bell Document Binder.

Notwithstanding this web of agreements, the parties evidently came into conflict over both the operation of the Airport site (which had opened for business), and the construction and operational planning for the Headhouse site (which was still in development). As a result of these differences, on December 10, 1998, Red Bell, James R. Bell, RBGSC, Red Cap, the Red Cap ESOP, Bella's Place, and GS Capital together entered into a "Settlement Agreement" which substantially recast the relationship among the parties. The Settlement Agreement terminated the LOI, *see* Settlement Agreement at 7, Tab A–2, RBGSC Document Binder, and contained a mutual release from any obligations arising from the previously-executed contracts whose performance was not addressed in the Settlement Agreement, *see* Settlement Agreement at 3.

Beyond this, the Settlement Agreement redefined various of the parties' roles with respect to the development and operation of the brew pubs. For example, Red Bell was released from the Construction Management Contract, and RBGSC was made construction manager, *see* Settlement Agreement at 4, though Red Bell was given a right of first negotiation in the event that GS Capital or its affiliates sought to sell all or some of its ownership interests in either site. While the License and Consulting Agreement was maintained, Red Bell was also prohibited from making any material decisions regarding the Airport

---

7. That is, this Agreement devolved onto Red Bell some of the management duties that Bella's Place had assumed in the Management Agreement that it had entered into with RBGSC.

8. Marketplace Redwood itself holds a lease on the property from the City of Philadelphia.

site without GS Capital's approval, *see* Settlement Agreement at 5. Further, RBGSC and GS Capital agreed to indemnify James R. Bell for any liabilities he incurred under the guaranty that he had executed pursuant to RBGSC's lease of the Headhouse site, *see* Settlement Agreement at 6.

The Settlement Agreement also extinguished Red Bell's potential right, pursuant to the LOI, to an equity share in the Headhouse project, and the Agreement explicitly provided that Red Bell's management rights with respect to the Headhouse site were restricted to those set forth in a Management Agreement to be entered into by the parties. Pursuant to this, on the same day that the Settlement Agreement was executed, a Management Agreement was entered into by Red Bell Brewery and Pub Company–Headhouse ("Red Bell–Headhouse") [9], RBGSC, and GS Capital concerning the Headhouse site. This Agreement contemplated that RBGSC would construct and own the Headhouse brew pub, and that Red Bell–Headhouse would manage and operate the pub in exchange for a fee. The Agreement also gave GS Capital, as investor, approval authority over the hiring of managers and chefs for the pub, as well as the right to terminate the contract for cause, *see* Management Agreement, Tab A–8, RBGSC Document Binder.

Notwithstanding the new alignment of responsibilities outlined in the Settlement Agreement, the relationship between the parties deteriorated further. This discord was evidenced by a letter dated March 17, 1999 from GS Capital's counsel to James R. Bell informing Bell that GS Capital considered Red Bell to be in default of its obligations under the various management and licensing contracts to which the entities were parties, *see* Letter of March 17, 1999, Tab A–9, RBGSC's Document Binder. The letter went on to list eight separate alleged events of default, including, *inter alia,* cost overruns in the construction of both the Airport and Headhouse sites, failure to adequately monitor personnel at the Airport site, failure to pay $75,000 into a tenant fund as required at the Airport site, and failure to maintain itself (Red Bell) as a solvent entity.[10] The letter announced that as a result of these alleged defaults, GS Capital would thereafter withhold Red Bell's incentive management fee. The letter closed with GS Capital's proposal for a final settlement of the parties' differences, under which Red Bell would buy out GS Capital's interest in the Airport site, while giving up any role in the Headhouse site.

In a letter from counsel on April 16, 1999, Red Bell denied all the allegations of default in the March 17, 1999 letter, *see* Letter of April 16, 1999, Exhibit [4], State Court Complaint, Tab 6, Supplemental R., Appeal of the Mar. 22, 2000 Order.

Subsequently, in a letter from counsel to James Bell dated May 3, 1999, RBGSC purported to terminate the Management Agreement with Red Bell for the Headhouse site, and, by the same letter, Bella's Place purported to terminate the License and Consulting Agreement for the Airport site, *see* Letter of May 3, 1999, Tab A–10, RBGSC Document Binder.[11] The terminations were to be effective at 5:00 p.m. on May 3, 1999, and in the letter RBGSC and Bella's Place claimed that the grounds for the termination were Red Bell's insolvency, as well as the other reasons cited in the March 17, 1999 letter.

9. This entity was formed by Red Bell, and by the terms of the Management Agreement, James R. Bell was to be Red Bell–Headhouse's CEO.

10. Red Bell's continuing solvency was a condition in some of the contracts.

11. The cited contractual provisions supporting the termination were paragraph 2.02 of the December 10, 1998 Management Agreement relating to the Headhouse site and paragraph 10 of the May 20, 1998 License and Consulting Agreement relating to the Airport site.

In its counsel's letter of May 19, 2000, Red Bell refused to accept the terminations contained in the May 3, 1999 letter and asserted that the terminations themselves constituted breaches of the agreements by RBGSC, GS Capital, and Bella's Place, *see* Exhibit [5], State Court Complaint.

On May 21, 1999, Red Bell and Red Bell–Headhouse filed suit against GS Capital, Bella's Place, RBGSC, and Nicholas Sommaripa (then RBGSC's president), claiming that the termination of the various agreements was without a legal basis, *see* State Court Complaint, Tab 6, Supplemental R., Appeal of the Mar. 22, 2000 Order. Red Bell sought injunctions preventing the state court defendants from terminating the License and Consulting Agreement for the Airport site and from terminating the Management Agreement for the Headhouse site (Counts I and II). The Complaint also sought damages for the defendants' alleged breach of the two agreements (Counts III and VI), specific performance of their duties thereunder (Counts IV and VII), and damages for defamation and interference with business relations (Counts VIII and IX).[12]

On June 3, 1999, following a conference with counsel for all parties, Judge Pamela P. Dembe of the Court of Common Pleas for Philadelphia County found, *inter alia*, that the termination of the agreements risked irreparable harm to Red Bell, and entered a temporary restraining order requiring the defendants to immediately comply with their obligations under the License and Consulting Agreement[13] to operate the Airport site as a Red Bell Brew Pub, *see* Order of June 3, 1999, Tab B–1, RBGSC Document Binder. The order scheduled a hearing on the preliminary injunction motion for June 30, 1999.

By an order dated June 16, 1999 following a conference with counsel in chambers, Judge Dembe modified the restraining order to permit the sale of other brands of beer (other than Red Bell) at the Airport site, directed the parties to take informal discovery, and confirmed the June 30, 1999 date for the preliminary injunction hearing, *see* Order of June 16, 1999, Tab B–2, RBGSC Document Binder.

In an order dated August 12, 1999, following a hearing, Judge Dembe again found that termination of the Management Agreement and the License and Consulting Agreement risked irreparable harm to Red Bell and that Red Bell had no adequate remedy at law, and granted preliminary injunctive relief to Red Bell with the following provisions: (1) defendants were enjoined from terminating the Management Agreement or the License and Consulting Agreement, (2) defendants were required to comply with all their obligations under the two agreements, and (3) defendants were enjoined from interfering with Red Bell's business relationships with suppliers, customers, or others, *see* Order of Aug. 12, 1999, Tab B–3, RBGSC Document Binder.

On September 13, 1999, counsel for Marketplace Redwood Limited Partnership, the sublessor of the Airport site, notified RBGSC in writing that Marketplace/Redwood was terminating RBGSC's sublease as of noon on September 14, 1999, *see* Letter of September 13, 1999, Tab 7, Supplemental R., Appeal of Mar. 22, 2000 Order. That notification letter referenced an earlier letter of August 9, 1999 purportedly informing RBGSC of its default, as well as

---

**12.** On July 27, 1999, following the entry of various orders by the Court of Common Pleas that we discuss below, the defendants answered the Complaint, including a counterclaim, which alleged that Red Bell, by virtue of having itself applied for a liquor license for the location and having contacted Liquor Control Board members, was interfering with the defendants' application for a liquor license at the Headhouse site, *see* Answer to State Court Complaint at 26, Tab 5, Supplemental R., Appeal of Mar. 22, 2000 Order.

**13.** The order explicitly outlined that the defendants would serve only Red Bell beer at the Airport site, and would otherwise use Red Bell trade dress at the site.

notice prior to that. As justification for the termination, Marketplace/Redwood cited, without limitation, to Section 21.40 of the sublease, which required that the Airport site be maintained pursuant to a license agreement with Red Bell or with another licensor acceptable to the landlord, *see* Sublease Agreement ¶ 21.40, Tab A–5, RBGSC Document Binder, Appeal of Mar. 22, 2000 Order.[14] A second letter from Marketplace/Redwood's counsel, dated September 14, 1999, informed RBGSC that Marketplace/Redwood had agreed to withhold taking action with respect to the termination announced in the previous day's letter until noon on September 17, 1999.

On September 16, 1999, RBGSC voluntarily petitioned for bankruptcy under Chapter 11.

In an order of September 23, 1999, Judge Dembe found GS Capital, Bella's Place, RBGSC, and Nicholas Sommaripa in contempt of the August 12, 1999 order granting the preliminary injunction, ordering them to pay Red Bell $60,000 and an additional $200 per day for the duration of their continuing non-compliance with the preliminary injunction. On September 29, 1999, the proceeding in the Court of Common Pleas was removed to the Bankruptcy Court.

### B. *Procedural Posture*

We here consider Red Bell and Red Bell–Headhouse's appeal of the Bankruptcy Court's order of March 22, 2000. This is the first of four appeals from orders entered in the RBGSC bankruptcy, as Red Bell and Red Bell–Headhouse have appealed the orders of November 2, 1999, January 5, 2000, March 15, 2000, and March 22,

2000. Although the March 22, 2000 order is the last appeal in time, it is the first appeal logically, since in their appeal the Appellants challenge the Bankruptcy Court's finding that the bankruptcy was not brought in bad faith, and the question of the legitimacy of the bankruptcy as a whole is naturally prior to issues of what was done within the bankruptcy, which constitutes the subject matter of the other appeals.

### II. *The Bankruptcy Court's Order of March 22, 2000 and the Issues on Appeal*

As the March 22, 2000 order revisited an issue that had been addressed earlier in the litigation, we will begin our discussion with that earlier order.

On October 12, 1999, Appellants here filed their motion to dismiss in the Bankruptcy Court, *see* First Motion to Dismiss, Tab 8, R., Appeal of Mar. 22, 2000 Order. In this motion, Appellants contended that the commencement of the bankruptcy was an improper litigation tactic designed to avoid the impact of the state court's orders, and argued that the bankruptcy should be dismissed or converted to Chapter 7 because of, *inter alia*, lack of good faith and an improper purpose. Appellees filed a responsive brief and on October 20, 1999, a hearing was held before former Bankruptcy Judge Scholl on the motion to dismiss, *see* Tr., Oct. 20, 1999, Tab 10, R., Appeal of Mar. 22, 2000 Order. Judge Scholl heard testimony from Nicholas Sommaripa, RBGSC's president; George Pallas, Esquire, former counsel to Red Bell; James Bell; and Robert Huttick,

---

**14.** In specific, Section 21.40 of the sublease provides:

Tenant [RBGSC] agrees that all of its operations at the Premises shall be conducted pursuant to a license agreement between Tenant or its managing agent and Red Bell Brewery Co. . . . . If operations in the Premises shall cease to be conducted pursuant to such license agreement for any reason . . .

the same shall constitute an Event of Default hereunder, unless, within thirty (30) days after such cessation, Tenant shall enter into a substitute license agreement, which substitute agreement and which licensor thereunder shall have been approved in writing by Landlord [Marketplace/Redwood] and Prime Landlord.

Sublease Agreement ¶ 21.40.

vice-president of Red Bell.[15] After the testimony concluded, Judge Scholl heard brief oral argument on the motion to dismiss. During these arguments, the Appellants contended that the bankruptcy was filed to undo the effects of the state court action, that GS Capital had created the various entities, and that GS Capital had effectively manipulated RBGSC into bankruptcy, evidencing the bad faith of the filing. Judge Scholl ruled from the bench, denying the motion to dismiss.

Subsequently, also on October 20, 1999 Judge Scholl entered the following one-page order:

> AND NOW, this 20th day of Oct., 1999, upon consideration of the Motion of Red Bell Brewing Company and Red Bell Brewery and Pub Company–Headhouse, Inc. for Dismissal of Chapter 11 Proceeding Or, in the Alternative, for Conversion to Chapter 7, after a hearing thereon this date, it is hereby
>
> ORDERED that this motion is DENIED. Assuming that there is a good faith filing requirement, this court finds that the Debtor had grounds for filing other than its intention to avoid certain state court rulings and that neither the U.S. Trustee nor creditors other than the Red Bell entities support the conclusion that dismissal would be in the best interests of creditors.

Order of Oct. 20, 1999, Tab 11, R., Appeal of Mar. 22, 2000 Order.

On February 22, 2000, the Appellants filed their second motion to dismiss, *see* Second Motion to Dismiss, Tab 12, R., Appeal of Mar. 22, 2000 Order. This second motion "renew[ed]" the motion to dismiss in light of our Court of Appeals's ruling in *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir.1999), which had come down on December 29, 1999. Appellants argued, on the basis of *SGL Carbon*, that the court must consider the totality of circumstances in determining whether good faith was present. Appellants reiterated their position that the filing was a litigation tactic, rather than a valid effort to reorganize, argued that RBGSC "is a mere pawn of GS Capital, a company with proven significant economic strength," and contended that the fact that GS Capital was itself financing the acquisition of RBGSC's restaurant operations demonstrated that GS Capital had caused the bankruptcy filing for its own benefit, Second Motion to Dismiss at 3–4. On these alleged facts, Appellants again sought dismissal on the basis of bad faith and improper purpose for filing.

The docket discloses that Judge Scholl held a hearing on this motion on March 22, 2000, *see* Docket at 28, ent. 254, Tab 6, R., Appeal of Mar. 22, 2000 Order. However, no transcript of this hearing is in the record before us, and the Appellants themselves did not include any such transcript in their designation of contents for inclusion in the record on appeal, *see* Designation, Tab 4, R., Appeal of Mar. 22, 2000 Order.

On March 22, 2000, Judge Scholl entered the following, partially handwritten, order:

> AND NOW, this 22nd day of March, 2000, upon the Second Motion of Red Bell Brewing Company and Red Ball [*sic*] Brewery & Pub Company–Headhouse for Dismissal of Chapter 11 Proceeding, and the Debtor's objection thereto, and hearing thereon, and for good cause shown,
>
> IT IS HEREBY ORDERED AND DECREED that, the Second Motion to Dismiss is DENIED. The prior un-

---

**15.** The Bankruptcy Court also, in considering the motion to dismiss, considered "evidence produced at the other hearings," Tr., Oct. 20, 1999 at 19 lines 13–14, an apparent reference to a hearing conducted on October 5, 1999, which included testimony from James Bell, *see* Tr., Oct. 5, 1999, Tab 1, Supplemental R., Appeal of Jan. 5, 1999 Order, and Nicholas Sommaripa, *see* Tr., Oct. 5, 1999, Tab 23, R., Appeal of Mar. 15, 1999 Order. It seems that there were other witnesses called at this hearing, but the various records before us do not include October 5, 1999 transcripts outside of the testimony of Bell and Sommaripa.

appealed order of Oct. 20, 1999, deciding the same motion filed earlier in this case appears to be *res judicata*, the unappealed confirmation order of Feb. 23, 2000, which would effectively be revoked if this motion were granted, is in fact revocable only for fraud. 11 U.S.C. § 1144. Finally, the facts here are not comparable to those of *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999).

Order of Mar. 22, 2000, Tab 3, R., Appeal of Mar. 22, 2000 Order.

On April 28, 2000 Red Bell and Red Bell–Headhouse filed an appeal from the March 22, 2000 order. According to the Appellants' brief, the sole issue presented by the appeal of the March 22, 2000 order is whether the Bankruptcy Court erred in failing to dismiss RBGSC's bankruptcy on the basis that it was filed in bad faith.

### III. *Appellate Jurisdiction and the Standard of Review*

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a) ("The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees ... of bankruptcy judges....").

In reviewing a bankruptcy court's decisions, we review its legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse thereof, *see In re Trans World Airlines, Inc.*, 145 F.3d 124, 131 (3d Cir. 1998). A "clearly erroneous" standard "is fairly stringent: 'It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data,' " *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs. Inc.*, 57 F.3d 1215, 1223 (3d Cir.1995) (quoting *Hoots v. Pennsylvania*, 703 F.2d 722, 725 (3d Cir.1983)). On the other hand, the *de*

*novo* portion of our review extends to the Bankruptcy Court's application of the law to the facts, *see In re O'Brien Envtl. Energy, Inc.*, 188 F.3d 116, 122 (3d Cir.1999).

### IV. *Analysis*

#### A. *The Disputes Between the Parties*

In this appeal, Appellants Red Bell and Red Bell–Headhouse claim that RBGSC's bankruptcy filing in September 1999 was in bad faith and solely intended as a litigation tactic to avoid the injunction Judge Dembe imposed in the state court action. Further, Appellants argue that RBGSC never needed the protection of bankruptcy in the first instance, since, *inter alia*, RBGSC was not the "owner" of the two brew pubs, and RBGSC was never a party to any of the contracts, but instead served as GS Capital's agent.

In response, Appellees RBGSC, GS Capital, Bella's Place, and Nicholas Sommaripa argue initially that Appellant's failure to appeal the order of October 20, 1999, which first found that the bankruptcy was not in bad faith, renders that judgment *res judicata* and that therefore Appellants can get no relief here on an appeal from the order of March 22, 2000 raising the same issue. Second, Appellees argue that the appeal of the dismissal should be denied as being moot, either as constitutionally moot because intervening events (here, most significantly, because the confirmation of the reorganization plan and the approval of the sale of RBGSC's assets have made it impossible for us to grant effective relief), or equitably moot in that it would be inequitable to reach the merits of the appeal where third parties have relied upon the plan of reorganization. Third, Appellees argue that in any event the Bankruptcy Court's finding that the bankruptcy was not filed in bad faith, and its subsequent refusal to dismiss the bankruptcy, were proper exercises of its authority.

**B.** *Is the Order of October 20, 1999 Res Judicata?*

■ The first issue we will approach is whether, as Appellees assert, and as the Bankruptcy Court found in its order of March 22, 2000, the Bankruptcy Court's prior, and unappealed, order of October 20, 1999, finding that the bankruptcy was not filed in bad faith, was *"res judicata"* [16]. In his March 22, 2000 order, Judge Scholl did not refine his use of the term "res judicata" [17], and, as the Appellees point out, several doctrines of preclusion might in fact be applicable here: claim preclusion, issue preclusion, or law of the case doctrine.

■ "Claim preclusion ... gives dispositive effect to a prior judgment if a particular issue, although not litigated, *could have been raised* in the earlier proceeding. Claim preclusion requires: (1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action." *CoreStates Bank, N.A. v. Huls America, Inc.*, 176 F.3d 187, 194 (3d Cir.1999). "Issue preclusion applies when (1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment." *In re Graham*, 973 F.2d 1089, 1097 (3d Cir.1992) (internal quotation marks omitted). Upon inspection of these requirements, however, we find that both claim and issue preclusion contemplate an earlier lawsuit and a later, separate suit in which either the same claim or a previously-litigated issue are present. Here, we have no separate suit; instead, a litigant in the bankruptcy sought a second ruling on

an issue upon which the court had previously entered a ruling in the same case. We therefore find that neither issue nor claim preclusion apply to the instant circumstances would be simply because of the absence of two separate cases.

■ We now turn to the "law of the case doctrine". "Unlike the more precise requirements of res judicata, law of the case is an amorphous concept. As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. Law of the case directs a court's discretion, it does not limit the tribunal's power." *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) (citations omitted). "The law of the case doctrine expresses the practice of courts generally to refuse to reopen what has been decided. Law of the case restrictions apply to subsequent rulings by the same judge in the same case or a closely related one. Although a trial judge has the power to reconsider an earlier decision, its authority to do so is limited by two prudential considerations: First, the court must explain on the record the reasoning behind its decision to reconsider the prior ruling. Second, the court must take appropriate steps so that the parties are not prejudiced by reliance on the prior ruling." *Raquel v. Education Management Corp.*, 196 F.3d 171, 183 (3d Cir. 1999) (internal quotation marks and citations omitted).

■ On the other hand, extraordinary circumstances, such as the availability of new evidence, the announcement of a supervening new law, or the appearance of manifest injustice may spur a court to

---

**16.** As the question of whether the prior order is res judicata is an issue of law, we review the Bankruptcy Court's finding *de novo*.

**17.** "The term 'res judicata' has both a broad and a narrow meaning. Narrowly ... it refers only to claim preclusion.... However, the preferred usage of the term encompasses

both claim and issue preclusion." *Venuto v. Witco Corp.*, 117 F.3d 754, 758 n. 5 (3d Cir. 1997). We therefore decline to construe the Bankruptcy Court's handwritten use of "res judicata" narrowly, and instead open our analysis up to the three possible preclusion doctrines outlined below.

reconsider previously decided issues, *see* *In re City of Philadelphia Litigation,* 158 F.3d 711, 718 (3d Cir.1998) (discussing the law of the case doctrine as exercised by our Court of Appeals).

Since, as discussed above, the law of the case doctrine guides a court's *discretion*, rather than, for example, dictating that certain decisions are final and given controlling authority, we should first look at the precise contents of each of the two orders. The order of October 20, 1999 denied Appellants' motion to dismiss the bankruptcy, and found that, assuming that there was indeed a good faith filing requirement, RBGSC had reasons for filing apart from the desire to avoid some state court rulings—that is, the Bankruptcy Court found that the existence of these other justifications showed that RBGSC had not violated the putative good faith standard. The order of March 22, 2000 again denied the Appellants' motion to dismiss, and did so on three separate grounds: (1) the order of October 20, 1999 was *"res judicata"*, (2) dismissing the bankruptcy would wrongly serve to revoke an unappealed confirmation order, and (3) the facts of this case were not comparable with those in *In re SGL Carbon Corp.,* 200 F.3d 154 (3d Cir.1999).

It is clear that the law of the case doctrine did not prevent the Bankruptcy Court from revisiting its prior decision, but instead served to guide its discretion in doing so. Here, the Bankruptcy Court stood by its prior decision, and in doing so—by its reference to *"res judicata"*—seemed to make reference to the essential principle of the law of the case doctrine, noted above, that what a court has decided should not be reopened.

■■■ In raising the issue of a bad faith filing for a second time before the Bankruptcy Court, Appellants in part relied on the fact that on December 29, 1999, well after the Bankruptcy Court had initially denied the motion to dismiss, our Court of Appeals held for the first time that "Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith." *In re SGL Carbon Corp.,* 200 F.3d 154, 160 (3d Cir.1999). While this decision certainly represents an intervening change in the law, such a change in the law serves to give a court justification for revisiting a prior decision under the law of the case doctrine, but it does not compel it to do so. Importantly, Judge Scholl in fact anticipated this change in the law in his October 20, 1999 order, which assumed the existence of such a standard. Moreover, he found that *SGL Carbon's* facts were not comparable to those presented here.

Upon consideration, however, we find that even if the law of the case doctrine applies to the order of March 22, 2000, we are still compelled to review the Bankruptcy Court's decision that the standards governing dismissal as the result of a "bad faith" filing do not apply to our case. We therefore cannot agree with Appellees that the law of the case doctrine prevents us from examining the merits of the Appellants' appeal.

■■■ We begin with the proposition that, since the law of the case doctrine rests with a court's discretion, the Appellants would be permitted to appeal an order, rooted in the law of the case doctrine, denying reconsideration on the basis that such a denial was an abuse of that discretion. That is to say, while the law of the case doctrine places at the discretion of the court the issue of whether to revisit an issue previously decided, this does not block appellate review of the exercise of that discretion. Here, the Bankruptcy Court decided that the prior denial of the motion to dismiss for a bad faith filing did not warrant revisitation partially on the basis of the fact that our case is not comparable to *SGL Carbon.* The Appellants have appealed *that* decision, and this places squarely before us the question of the application of the standards set forth in *SGL Carbon* to this case.

As it happens, this, in practice, must amount to a review of the Bankruptcy Court's application of *SGL Carbon*, and thus our review of the Bankruptcy Court's decision not to revisit its previous holding will be identical to a review of the denial of the motion to dismiss itself. Further, we find that our review of the Bankruptcy Court's decision is not barred by the fact that the October 20, 1999 order assumed the existence of a good faith standard, because *SGL Carbon* did more than simply establish the good faith requirement: it served to define, to at least some degree, the contours of that requirement.

Obviously, this is an unusual case in that the intervening change in the law is one hundred percent on point with the issue the Bankruptcy Court decided. Not every intervening change in the law, we recognize, would make review of a court's decision not to reconsider the same as a merits review of the decision itself. Nonetheless, we must now examine the Bankruptcy Court's finding that *SGL Carbon* was not comparable to our present case and whether the current case was filed in violation of that good faith requirement.[18]

### C. Was the Bankruptcy Filed in Bad Faith?

#### 1. In re SGL Carbon Corp., 200 F.3d 154 (3d Cir.1999)

Our examination of the Bankruptcy Court's finding that the bankruptcy was not filed in bad faith must begin with *In re SGL Carbon Corporation*, the recent decision of our Court of Appeals that first established in this Circuit a good faith requirement for Chapter 11 bankruptcy filings. In order to understand the possible application of *SGL Carbon* to our case, we must examine its facts and holding in some detail.

SGL Carbon manufactured and sold graphite electrodes used in steel production, and was faced with a class action antitrust lawsuit. SGL Carbon subsequently petitioned for bankruptcy under Chapter 11, and in its disclosure statement discussed only the antitrust litigation as a reason leading to the filing. In its explanatory press release, SGL Carbon stated that it had filed for bankruptcy to protect against the claims made by the antitrust plaintiffs, and the press release contained the affirmative statement that SGL Carbon was financially healthy. The Official Committee of Unsecured Creditors filed a motion to dismiss the bankruptcy, arguing that the bankruptcy was a litigation tactic intended to frustrate the antitrust claims. *See SGL Carbon*, 200 F.3d at 157–58.

After a hearing, the district court denied the motion to dismiss. The District Court assumed that there was a good faith standard, but concluded that the bankruptcy petition furthered the purpose of Chapter 11 because the antitrust litigation was placing SGL Carbon's operations in peril by distracting management, and also was potentially ruinous in that the litigation might eventually force the company out of business. *See SGL Carbon*, 200 F.3d at 158.

■ On appeal, our Court of Appeals reversed the district court's decision, holding that *SGL Carbon's* Chapter 11 petition had been filed in bad faith and was subject to dismissal pursuant to 11 U.S.C. § 1112(b). The panel found, first, that the decision of whether to dismiss a Chapter 11 petition is committed to the "sound discretion of the bankruptcy or district court," and thus such decisions should be reviewed under an abuse of discretion standard, *SGL Carbon*, 200 F.3d at 159. Since "an abuse of discretion exists where the district court's decision rests upon a

---

**18.** Our standard of review of the Bankruptcy Court's decision is the same whether this is viewed as a direct review of the decision or as a review of the decision not to revisit the October 20, 1999 order. As noted in the text, the decision, under the law of the case doc-trine, of whether to revisit a prior decision is committed to the discretion of the court. Similarly, as will be detailed in our discussion of *SGL Carbon* below, the decision of whether to dismiss a Chapter 11 petition is also within the court's discretion.

clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact," *SGL Carbon*, 200 F.3d at 159, the panel reviewed "findings of fact leading to the decision for clear error and exercise[d] plenary review over the court's conclusions of law," *SGL Carbon*, 200 F.3d at 159.[19]

The panel then examined 11 U.S.C. § 1112(b), which allows a court to dismiss or convert a Chapter 11 petition for cause, and concluded that under this statute Chapter 11 bankruptcy petitions "are subject to dismissal ... unless filed in good faith," *SGL Carbon*, 200 F.3d at 160. Having come to that conclusion, the panel moved on to consider the district court's finding of facts, and then examined the totality of facts and circumstances to determine if they supported a finding of good faith, *see SGL Carbon*, 200 F.3d at 162. The panel noted that once the issue of good faith is raised, the petitioner has the burden of establishing that the filing was in good faith, *see SGL Carbon*, 200 F.3d at 162 n. 10.

Upon examining the district court's factual findings, the panel found clearly erroneous the conclusions that (1) the distractions from the antitrust litigation presented a threat to SGL Carbon's operations and (2) SGL had to petition for Chapter 11 when it did because of the potential for ruin presented by the antitrust litigation, *see SGL Carbon*, 200 F.3d at 162. However, despite holding these particular findings clearly erroneous on the facts of the case, the panel explicitly noted that under the "proper circumstances" managerial distractions and "other litigation harms" might constitute factors contributing to good ·faith, *SGL Carbon*, 200 F.3d at 162 n. 11.

The panel then canvassed the circumstances surrounding the SGL Carbon filing. The panel agreed that a debtor need

not be insolvent prior to filing, *see SGL Carbon*, 200 F.3d at 163, and that there is no requirement for a showing of specific evidence of insolvency prior to filing, *see SGL Carbon*, 200 F.3d at 164. The panel noted, however, that premature filing remains inappropriate and that petitions without a valid reorganizational purpose cannot be allowed, *see SGL Carbon*, 200 F.3d at 163, and also that the "mere possibility of a future need to file, without more, does not establish that a petition was filed in 'good faith,'" *SGL Carbon*, 200 F.3d at 164.

The panel went on to find that the absence of a valid reorganization purpose for the Chapter 11 filing constituted bad faith and warranted dismissal of the petition, *see SGL Carbon*, 200 F.3d at 166, but also noted that "no list is exhaustive of all the factors which could be relevant when analyzing a particular debtor's good faith," *SGL Carbon*, 200 F.3d at 166 n. 16. The panel concluded that SGL Carbon had no valid reorganization purpose, noting the company had a net worth of $124 million at the time of filing, and that there was no evidence either that the company had difficulty meeting its debts as they came due, that it had overdue debts, that it had defaulted on debts, or that it had difficulties borrowing money, *see SGL Carbon*, 200 F.3d at 166. The panel also focused on the company's statements that admitted it was seeking Chapter 11 solely because of the litigation, *see SGL Carbon*, 200 F.3d at 167.

### 2. Assessment of the Bankruptcy Court's Application of the Good Faith Requirement

 We will begin our assessment of the Bankruptcy Court's decision regarding bad faith with its finding, expressed in the October 20, 1999 order, that RBGSC had reasons to file its Chapter 11 petition outside of a desire to avoid the state court

---

**19.** That is, although review the exercise of discretion itself is reviewed to ensure it is not "arbitrary, fanciful, or unreasonable," *In re Camden Ordnance Mfg. Co.*, 245 B.R. 794, 797 (E.D.Pa.2000), we review the findings of fact and conclusions of law leading to that discretionary exercise according to the clear error and plenary standards respectively.

preliminary injunction.[20] As this is a factual finding, we review it for clear error, and we find that there is no such error here because the record discloses the existence of just such reasons.

As discussed above, in the days immediately prior to September 16, 1999, the date of RBGSC's petition, RBGSC was informed by its landlord at the Airport site that the landlord intended imminently to terminate RBGSC's lease of the site. As the Headhouse site was not yet operational, the Airport site, which was a going concern, was an important—perhaps, at the time, *the* most important—asset for RBGSC. The Chapter 11 petition served to prevent Marketplace/Redwood from terminating the lease, and thus protected RBGSC's interest in the Airport site.

The Bankruptcy Court's finding that RBGSC had reasons beyond the desire to avoid the preliminary injunction in its state court suit with Red Bell thus survives clear error review.

Appellants, however, do not take issue with this finding, and in fact barely address it in their papers.[21] Instead, the Appellants first argue that the Chapter 11 filing was in bad faith because it was "solely" a litigation tactic, *see* Appellants' Brief, appeal from March 22, 2000 order at 13. In support of this claim, Appellants aver both that the Appellees violated the state court orders and that RBGSC was in fact solvent at the time of its bankruptcy, factors the Appellants claim support a finding of bad faith, *see* Appellants' Brief, appeal from March 22, 2000 order at 14–16.

These arguments do not convince us to reverse the Bankruptcy Court's decision. As discussed above, the *SGL Carbon* panel stressed that the decision regarding the dismissal of a bankruptcy petition is in the bankruptcy court's discretion, and also that the finding regarding a party's good faith in filing is made on the totality of the circumstances, with any number of factors at play in the decision of whether good faith indeed existed. On this standard, the mere claim that the bankruptcy gave the debtor an advantage in state court litigation, even if true, cannot serve as grounds for reversing the Bankruptcy Court's decision that good faith existed. Similarly, the *SGL Carbon* panel explicitly stated that a party need not be insolvent to file Chapter 11, and thus Appellants' claim that RBGSC was solvent, even if true, does not compel any reversal of the Bankruptcy Court's decision here. Though *SGL Carbon* did hold that the absence of a valid reorganizational purpose is grounds for dismissal under bad faith, the Appellants' arguments—particularly as they fail seriously to contest the Bankruptcy Court's finding that RBGSC had reasons outside the state court action to file its petition—do not go to show error in the Bankruptcy Court's implicit conclusion that such a valid reorganizational purpose existed because of the threat to terminate the Airport sublease.

Importantly, *SGL Carbon* confirmed that the decision to dismiss is dedicated to the Bankruptcy Court's discretion. Here, Appellants' first set of arguments, having failed to show that there was any clear error of fact or error of law[22], does not

---

20. While we are here reviewing the March 22, 2000 order, that order's explicit reference to the October 20, 1999 order places into our consideration the findings of that order.

21. They address it as follows: "As for the excuse that RBGSC would lose the Airport lease, this is far more offensive to the interests of justice than the attempt to avoid litigation costs noted in *In re SGL*." Appellants' Reply Brief on appeal of March 22, 2000 order at [13].

22. In the March 22, 2000 order, the Bankruptcy Court found that the facts of this case were not comparable to *SGL Carbon*. To the extent that this represents an application of law to facts, we review it *de novo*. Upon consideration, we cannot find reason to reverse the Bankruptcy Court's finding. *SGL Carbon*, as detailed above, involved a firm that publicly and clearly declared that while it was financially healthy, it was filing for bankruptcy protection solely because of an antitrust claim brought against it. Here, while

prompt us to conclude that there was an abuse of discretion. The Bankruptcy Court, finding that RBGSC was at immediate risk of losing its lease at the airport, had a reasonable and rational basis for concluding that there was no bad faith and thus for refusing to dismiss RBGSC's petition.

Appellants next urge upon us a second line of argument. RBGSC, they argue, was in reality never in need of the protection of the Bankruptcy Court, and for that reason the Chapter 11 filing is in bad faith. Appellants' fundamental argument here is that RBGSC in fact had no separate existence of its own and instead was a complete puppet of GS Capital. Consequently, for example, to the extent that RBGSC claims it has debts to GS Capital, these debts are said to have been a mere fiction of accounting, whereby GS Capital transferred to RBGSC the debts it accumulated in financing the brew pubs, a fact which then allowed GS Capital to provoke RBGSC's bankruptcy whenever that bankruptcy suited GS Capital's interests. *See* Appellants' Brief at 20, Appeal of the Mar. 22, 2000 Order.

As the Appellees point out, these arguments are present in other of the currently pending appeals from this bankruptcy. In particular, in the order of January 5, 2000, see *RBGSC II*, 242 B.R. at 859–60, the

Bankruptcy Court found that the evidence did not support reverse veil-piercing under Appellants' claim that RBGSC was an alter ego of GS Capital. Appellants have appealed that finding in the January 5, 2000 order, and their arguments on bad faith here are quite similar.

In considering this second line of argument, however, a threshold question must be whether it was ever in the first instance fairly presented to the Bankruptcy Court. As noted in our initial discussion of the orders on appeal, this argument does not appear at all in the Appellants' first motion to dismiss, and was mentioned only briefly during oral argument before Judge Scholl on October 20, 1999. Similarly, the issue is mentioned, without any supporting argument, only in passing in the second motion to dismiss. Having failed to present these arguments in a way that the Bankruptcy Court could reasonably have been expected to consider, we find that the Appellants' extensive arguments regarding the interrelationships between RBGSC, GS Capital, Bella's Place, and Red Cap are not properly before us in reviewing the Bankruptcy Court's decision to deny the motion to dismiss.[23]

In conclusion, we find that under the standards set forth in *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir.1999), the

there was ongoing litigation involving RBGSC, the letters from Marketplace/Redwood show that RBGSC was in the throes of having the Airport lease terminated, which would serve to divest RBGSC of its only income-producing asset. While RBGSC evidently did threaten that it might file bankruptcy during the contentious discussions that surrounded the state court suit, *see, e.g.*, Tr., Oct. 20, 1999 at 100 (testimony of George Pallas), this is nowhere near the bald public post-petition declarations that SGL Carbon made. Thus, to the extent that our case is similar to *SGL Carbon* in that it concerns a debtor involved in pre-petition litigation, we agree with the Bankruptcy Court that the facts of *SGL Carbon* do not compel a finding of bad faith here.

**23.** We hasten to note that it is far from clear to us that, even taking the Appellants' claims

of the close relationships between RBGSC and the other entities as true, a finding of bad faith would necessarily follow. For example, Appellants argue that GS Capital, which provided the funding for the brew pubs, was in fact the real power behind RBGSC's decisions, and that GS Capital, by controlling the bankroll, exercised control over the disbursement of money, where RBGSC itself had no such power. As detailed above, the question of the existence of bad faith involves the consideration of any number of factors, and the fact that RBGSC was in many senses captive to its venture capitalist did not, by itself, render RBGSC's use of Chapter 11 to protect itself in bad faith. Again, the finding of bad faith remains in the discretion of the Bankruptcy Court, and we find nothing here to conclude that what the Bankruptcy Court did was outside of the bounds of that discretion.

Bankruptcy Court did not abuse its discretion in denying Appellants' motion(s) to dismiss the bankruptcy owing to bad faith pursuant to 11 U.S.C. § 1112(b).[24] We therefore will affirm the finding of the Bankruptcy Court.

24. Having so found, we need not consider Appellees' contention that various doctrines of mootness bar our review here.